[No. 85230-8.   En Banc.]
Argued June 14, 2011.     Decided February 16, 2012.

BONNIE ANTHIS, *Individually and as Personal Representative, Respondent*, v. WALTER WILLIAM COPLAND, *Appellant.*

*Hal J. Geiersbach* and *Shannon M.W. Kraft* (of *Geiersbach & Kraft PSC*); *Sean P. Cecil*; *Lisa M. Worthington-Brown*; and *Diana M. Dearmin* and *Paul Fogarty* (of *Dearmin Fogarty PLLC*), for appellant.

*John G. Schultz* and *Andrea J. Clare* (of *Leavy Schultz Davis & Fearing PS*), for respondent.

*Paul A. Neal* on behalf of Washington State Patrol Troopers Association, amicus curiae.

*John C. Dempsey* and *Margaret A. McCann* on behalf of American Federation of State, County and Municipal Employees, AFL-CIO, amicus curiae.

¶1 CHAMBERS, J. — Bonnie Anthis won a civil suit against Walter Copland for the wrongful death of her husband,

Harvey Anthis. Anthis sought to collect Copland's only known asset, his retirement pension, to satisfy the judgment. Copland, a retired police officer, argued that his Law Enforcement Officers' and Firefighters' Retirement System (LEOFF) pension money cannot be garnished even after it has been deposited into his personal bank account. The trial court disagreed and ruled that the money in the account could be garnished. Copland appealed, and the Court of Appeals certified the question to this court. We accepted certification and now affirm the trial court.

FACTS

¶2 Sometimes lives are altered, even destroyed, so suddenly and unexpectedly as to defy explanation. Copland, a retired police officer from the city of Tacoma, spent the day with a friend, John Stevens, in Kennewick, Washington. They spent some time at the Burbank Tavern in nearby Walla Walla County and then returned to Stevens' house in Kennewick. *In re Copland*, No. 09-47782, 2010 WL 4809327, at *1, 2010 Bankr. LEXIS 4161, at *2 (Bankr. W.D. Wash. Sept. 23, 2010) (unpublished).

¶3 On the way, Copland stopped to buy whiskey and vodka. At Stevens' house Stevens' longtime friend Anthis joined the pair. The three passed the afternoon on Stevens' outdoor deck drinking, eating, and enjoying conversation about upcoming fishing trips. That evening, in events described as "stunning both in their rapidity and unexpectedness," Copland said to Anthis, " 'I could shoot and kill you,' " and Anthis responded, " '[B]ring it on.' " 2010 WL 4809327, at *1, 2010 Bankr. LEXIS 4161, at *2. Copland produced a .22 derringer and placed it up to Anthis' right temple. No argument preceded the exchange, and Anthis did not move. Stevens saw the flash, heard the shot, and saw Anthis fall off his chair to the floor. Copland then returned to his seat, put the gun in his back pocket, placed his head in his hands and said, " 'Oh, my God, I've killed

Al.' " 2010 WL 4809327, at *1, 2010 Bankr. LEXIS 4161, at *2. In a flash, two lives were destroyed.

¶4 Copland was convicted of first degree manslaughter and is serving time in prison. *See State v. Copland*, noted at 140 Wn. App. 1006, 2007 WL 2254420, 2007 Wash. App. LEXIS 2341. Separately, the estate of Harvey Anthis obtained a civil judgment against Copland for the shooting death of Anthis. *See Anthis v. Copland*, noted at 146 Wn. App. 1020, 2008 WL 2933716, 2008 Wash. App. LEXIS 1863. After the civil judgment was upheld, Anthis attempted to collect Copland's pension funds. Copland claimed his pension funds were exempt from garnishment or attachment. The trial court disagreed and ruled that the funds were not exempt once deposited into Copland's personal bank account. Copland appealed the trial court's ruling to the Court of Appeals. Br. of Appellant at 2. Copland also filed bankruptcy and attempted to discharge the estate's judgment. Resp't's Suppl. Br. (Ex. 1) at 7. The Court of Appeals stayed Copland's case pending determination of whether the bankruptcy proceedings precluded the Court of Appeals from asserting jurisdiction. *See id.* at 1-3. The parties provided documentation showing that the bankruptcy proceeding did not preclude the Court of Appeals from asserting jurisdiction. *See id.*; *see also* Appellant's Suppl. Br. App. (Decl. of Lisa Worthington-Brown). The Court of Appeals lifted the stay but certified the matter to this court, and we accepted certification.[1] We affirm the trial court.

STANDARD OF REVIEW

██ ¶5 Construction of a statute is a question of law reviewed de novo. *State v. Wentz*, 149 Wn.2d 342, 346, 68 P.3d 282 (2003) (citing *City of Pasco v. Pub. Emp't Relations Comm'n*, 119 Wn.2d 504, 507, 833 P.2d 381 (1992)). A court

---

[1] The bankruptcy court eventually ruled the debt "arises from a willful and malicious injury and is not dischargeable." *Copland*, 2010 WL 4809327, at *3, 2010 Bankr. LEXIS 4161, at *8.

interpreting a statute must discern and implement the legislature's intent. *State v. J.P.*, 149 Wn.2d 444, 450, 69 P.3d 318 (2003) (citing *Nat'l Elec. Contractors Ass'n v. Riveland*, 138 Wn.2d 9, 19, 978 P.2d 481 (1999)). Where the plain language of a statute is unambiguous and legislative intent is apparent, we will not construe the statute otherwise. *Id.* Plain meaning may be gleaned "from all that the Legislature has said in the statute and related statutes which disclose legislative intent about the provision in question." *Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 11, 43 P.3d 4 (2002) (citing *Cockle v. Dep't of Labor & Indus.*, 142 Wn.2d 801, 808, 16 P.3d 583 (2001)). If the statute is still "susceptible to more than one reasonable interpretation, then a court may resort to statutory construction, legislative history, and relevant case law for assistance in determining legislative intent." *Christensen v. Ellsworth*, 162 Wn.2d 365, 373, 173 P.3d 228 (2007) (citing *Cockle*, 142 Wn.2d at 808). Exemption statutes should be liberally construed to give effect to their intent and purpose. *In re Elliott*, 74 Wn.2d 600, 620, 446 P.2d 347 (1968) (citing *N. Sav. & Loan Ass'n v. Kneisley*, 193 Wash. 372, 378, 76 P.2d 297 (1938)).

STATUTORY CONSTRUCTION

a. *Plain Meaning of the Statute*

¶6 Chapter 41.26 RCW lays out the LEOFF retirement system. The statute at issue in this case states:

> Subject to subsections (2) and (3) of this section, the right of a person to a retirement allowance, disability allowance, or death benefit, to the return of accumulated contributions, the retirement, disability or death allowance itself, any optional benefit, any other right accrued or accruing to any person under the provisions of this chapter, and the moneys in the fund created under this chapter, are hereby exempt from any state, county, municipal, or other local tax and shall not be subject to execution, garnishment, attachment, the operation of bankruptcy or insolvency laws, or any other process of law whatsoever, and shall be unassignable.

RCW 41.26.053(1). The question is whether this statute exempts the listed benefits from legal process even after the benefits have been distributed to the beneficiary. Copland argues that it does. Br. of Appellant at 5-6. But the statute by its terms does not indicate whether the legislature intended the various exempted rights listed to extend protection to the money after it has been distributed.

¶7 Other benefits exemption statutes in Washington are similar, but not identical, to the LEOFF exemption statute. RCW 41.40.052(1) exempts retirement benefits of members of the Public Employees' Retirement System (PERS):[2]

> Subject to subsections (2) and (3) of this section, the right of a person to a pension, an annuity, or retirement allowance, any optional benefit, any other right accrued or accruing to any person under the provisions of this chapter, the various funds created by this chapter, and all moneys and investments and income thereof, are hereby exempt from any state, county, municipal, or other local tax, and shall not be subject to execution, garnishment, attachment, the operation of bankruptcy or insolvency laws, or other process of law whatsoever, and shall be unassignable.

There are several differences in language between the PERS statute and the LEOFF exemption statute. Most significantly, the LEOFF statute exempts both the right "to a retirement allowance" and the right "to . . . *the* retirement . . . allowance *itself.*" RCW 41.26.053(1) (emphasis added). But some exemption statutes exempt only the right "to a . . . retirement allowance." *See, e.g.*, RCW 41.40.052(1) (PERS); RCW 2.12.090 (judicial pension exceptions).

¶8 The exemption statute relating to private pension plans contains language similar to the PERS exemption statute:

> The right of a person to a pension, annuity, or retirement allowance or disability allowance, or death benefits, or any

---

[2] The language used is identical to several other exemption statutes for other non-LEOFF public employee pensions. *See* RCW 41.37.090 (public safety employees); RCW 41.32.052 (public school teachers).

optional benefit, or any other right accrued or accruing to any citizen of the state of Washington under any employee benefit plan, and any fund created by such a plan or arrangement, shall be exempt from execution, attachment, garnishment, or seizure by or under any legal process whatever.

RCW 6.15.020(3).[3] Again, like the PERS statute, this statute exempts only the right "to a . . . retirement allowance." Unlike the LEOFF statute, it does not exempt the right to the allowance itself.

¶9 Yet another statute lays out exemptions for federal benefits:

Unless otherwise provided by federal law, any money received by any citizen of the state of Washington as a pension from the government of the United States, whether the same be in the actual possession of such person or be deposited or loaned, shall be exempt from execution, attachment, garnishment, or seizure by or under any legal process whatever . . . .

RCW 6.15.020(2). The difference in this language is immediately apparent; it plainly states that federal pensions are exempt whether they are "in the actual possession of [the pensioner] or be deposited or loaned." That language is conspicuously absent in the nongovernment benefits subsection (3) above, which is essentially the same as the public employee statute in giving an exemption for the "right" to a "retirement allowance." RCW 6.15.020(3).

¶10 Copland in his briefing relies in part on the fact that the LEOFF exemption statute contains different language—"the right to *the* retirement allowance *itself*"—than the PERS and other exemption statutes for both public and private employees. Br. of Appellant at 4-6 (emphasis added). An examination of other state exemption statutes containing similar language reveals this is not a principled basis upon which to make a distinction.

---

[3] This statute, like several others in this opinion, was changed in a recent legislative session. Some changes have already become effective while others are delayed until 2018. *See* Laws of 2011, ch. 162. None of the changes are relevant to our analysis.

¶11 Nearly all exemption statutes contain the same language, or substantially similar language, as the PERS or LEOFF statutes that exempt either the right to "a retirement allowance" or the retirement allowance "itself," and do not contain any language similar to that in the federal exemption statute suggesting that funds remain exempt postdistribution. *E.g.*, RCW 2.10.180 (judicial pensions); RCW 2.12.090 (same); RCW 6.15.020(3) (pension money from employee benefit plan); RCW 41.20.180 (police pensions in first-class cities); RCW 41.28.200 (public employees in certain first-class cities); RCW 41.32.052 (teacher pensions); RCW 41.34.080 (plan 3 pension funds); RCW 41.35-.100 (school employee pensions); RCW 41.37.090 (public safety employee pensions); RCW 41.44.240 (city employee pensions); RCW 43.43.310 (Washington State Patrol).[4] Some of the exemption statutes contain the "allowance itself" language. *E.g.*, RCW 2.10.180 (judicial pensions); RCW 41.26.053 (LEOFF); RCW 41.28.200 (public employees in certain first-class cities). Some contain only the "right to a retirement allowance" language. *E.g.*, RCW 41.32.052 (teachers); RCW 41.37.090 (public safety employees); RCW 41.40.052 (PERS). We perceive no reason why the legislature would provide substantially different protections for these various groups of beneficiaries.

¶12 The legislature has given us no justification for treating the LEOFF statute differently from other benefits exemption statutes. The question therefore becomes whether the language in the LEOFF exemption statute and the PERS and other exemption statutes—"the right to the retirement allowance itself" or "the right to a retirement allowance"—means the same thing as the language in the federal benefits exemption statute—"whether . . . in actual possession . . . or be deposited or loaned." *Compare* RCW 41.26.053(1), *and* RCW 41.40.052(1), *with* RCW 6.15.020(2).

---

[4] One exemption statute in Washington contains language found by the United States Supreme Court to protect funds after disbursement to the beneficiary in the context of Social Security. RCW 41.24.240 (volunteer fire fighter and reserve officer pensions). This is discussed further below at note 14.

### b. *Case Law*[5]

¶13 This is a question of first impression in Washington.[6] Because of the lack of Washington case law, we find it useful to explore how other federal and state courts have dealt with benefits exemption statutes in other jurisdictions to aid our interpretation of the statute at issue here.

¶14 Courts in other jurisdictions have generally, but not universally, held that some unambiguous reference to money actually paid to or in the possession of the pensioner is necessary in order to find that pension funds retain their exempt status postdistribution. For example, in the federal courts, the language in the Social Security Act prohibiting garnishment of " 'the moneys paid or payable' " to a beneficiary has been held protected even after deposit. *Philpott v. Essex County Welfare Bd.*, 409 U.S. 413, 415-17, 93 S. Ct. 590, 34 L. Ed. 2d 608 (1973) (Social Security funds on deposit retain protection as " 'moneys paid' " (quoting Social Security Act of 1935, ch. 531, § 208, 49 Stat. 620, 625 (1935))). Similarly, language in the World War Veterans' Act of 1924[7] that funds were exempt " 'either before or after

---

[5] An extensive review of the legislative history of the exemption statutes sheds little light on the issue of whether funds may be garnished postdistribution. We therefore do not address legislative history. Similarly, there is no particular canon of construction that will aid us in determining whether language exempting a "right" to benefits continues to protect funds once they are in the beneficiary's bank account.

[6] In its amicus brief, the Washington State Patrol Troopers Association directs the court's attention to a Court of Appeals case interpreting the PERS (rather than LEOFF) benefits exemption statute, which contains substantially similar language granting the "right" to a "retirement allowance." RCW 41.40.052(1). In *Boronat*, the Court of Appeals held that Mr. Boronat's pension could not be attached by Mrs. Boronat. *Boronat v. Boronat*, 13 Wn. App. 671, 674, 537 P.2d 1050 (1975). But Mrs. Boronat "filed and served a writ of garnishment on the Washington State Employees Retirement System, seeking to recover from [Mr. Boronat's] contributions the amount owed her." *Id.* at 672. That is precisely the kind of action that the statute here plainly prohibits. The question is whether such funds *remain* exempt once they leave the possession of the State and come into the possession of the beneficiary.

[7] Since its inception, the World War Veterans Act of 1924 has undergone many amendments and now carries the popular name of "Veterans Benefits Act" or

receipt by the beneficiary' " has been held to protect funds postdistribution. *Porter v. Aetna Cas. & Sur. Co.*, 370 U.S. 159, 160-62 & n.1, 82 S. Ct. 1231, 8 L. Ed. 2d 407 (1962) (veterans' benefits paid into savings and loan account were readily withdrawable and therefore retained protection (quoting World War Veterans' Act of 1924, ch. 510, § 3, 49 Stat. 607, 609 (1935))).

¶15 In contrast, the 1st, 2nd, 3rd, 9th, and 10th Circuits hold that language in the ERISA (Employee Retirement Income Security Act) statutes stating that " '[e]ach pension plan shall provide that benefits provided under the plan may not be assigned or alienated' " does permit garnishment after the funds are deposited into the personal accounts of pensioners. *Hoult v. Hoult*, 373 F.3d 47, 51 (1st Cir. 2004) (alteration in original) (quoting 29 U.S.C. § 1056(d)(1)); *see also id.* at 54 ("If Congress had intended [the ERISA antialienation provision] to reach that far, it could easily have employed the type of language found, for example, in the Veterans Benefits Act which prohibits attachment of benefits 'either before or after receipt by the beneficiary.' That Congress chose not to do so is significant." (citation omitted)). *But see United States v. Smith*, 47 F.3d 681, 684 (4th Cir. 1995) ("The government should not be allowed to do indirectly what it cannot do directly; it cannot require Smith to turn over his pension benefits in a lump sum, nor can it require him to turn over his benefits as they are paid to him.").[8,9]

---

"Veterans' Benefits Act." The act is referred to in other cases cited herein by these later names, but the exemption language at issue has remained the same.

[8] Only the 1st, 2nd, 3rd, 4th, 9th, and 10th Circuits have addressed the issue. The Fourth Circuit stands alone in its disagreement.

[9] Although it has been characterized as dicta and thus not binding, the United States Supreme Court also appears to disagree with the Fourth Circuit, stating that "[[t]he ERISA exemption statute] bars the assignment or alienation of pension plan benefits, and thus prohibits the use of state enforcement mechanisms only insofar as they prevent those benefits from being paid to plan participants." *Mackey v. Lanier Collection Agency & Serv., Inc.*, 486 U.S. 825, 836, 108 S. Ct. 2182, 100 L. Ed. 2d 836 (1988) (emphasis omitted).

¶16 Cases decided under state law have tended to follow the federal holdings requiring explicit language to exempt benefit payments deposited into a personal bank account or otherwise placed into the personal possession of the debtor.[10] A federal bankruptcy court applying Indiana law, for example, held that the Indiana statute at issue did not exempt funds postdistribution to the beneficiary because there was "no clear, explicit statement in [the statute] that the exemption provided for in an interest in a retirement fund applies to a distribution from such a fund in the hands of the participant." *In re Miller*, 435 B.R. 561, 568 (Bankr. N.D. Ind. 2010). In an earlier case also applying Indiana law, the court noted that "[w]here the legislature of Indiana has given exemptions [to money in the hands of the debtor] it has chosen statutory language which is clear and unequivocal." *In re Weaver*, 93 B.R. 172, 174 (Bankr. N.D. Ind. 1988).

¶17 Courts in Michigan, Tennessee, and Kansas have similarly held explicit language is required. A Michigan court of appeals recently held that garnishment was permissible after deposit of funds into the beneficiary's account where the exemption statute did "not include an express prohibition against garnishment of 'moneys paid' as retirement benefits, but instead only protects a retiree's *right* to a benefit." *Whitwood, Inc. v. S. Blvd. Prop. Mgmt. Co.*, 265 Mich. App. 651, 655, 701 N.W.2d 747 (2005). A federal bankruptcy court applying Tennessee law held that where one Tennessee statute expressly exempted all moneys received as a pension " 'before receipt, *or while in the resident's hands or upon deposit in the bank,*' " another Tennessee exemption statute that did not contain such express

---

[10] Some courts have also found significant language stating that an interest shall not be subject " 'to garnishment, attachment or other legal process *under any circumstances whatsoever . . . .*' " *See In re Miller*, 435 B.R. 561, 567 n.5 (Bankr. N.D. Ind. 2010) (emphasis added) (quoting 45 U.S.C. § 231m(a) (Railroad Retirement Act)). This does at first seem similar to provisions in several of our state exemption statutes, which contain some variation of "or any other process of law whatsoever." RCW 41.26.053(1). But this argument fails because "any process whatsoever" is entirely different from "any circumstances whatsoever."

language did not protect money after it came into the possession of the beneficiary. *In re Lawrence*, 219 B.R. 786, 794 (Bankr. E.D. Tenn. 1998) (quoting TENN. CODE ANN. § 26-2-104(a)). A bankruptcy court in Kansas adopted the reasoning of the *Lawrence* court in interpreting similar state statutes. *In re Adcock*, 264 B.R. 708, 711-12 (Bankr. D. Kan. 2000).[11]

¶18 Both federal and state cases generally indicate that statutorily exempt funds, whatever their predistribution nature, may be garnished after they come into the personal possession of the beneficiary, including deposit into a personal account, unless the legislature provides some express language to the contrary.[12]

## c. *Other Exemptions in Washington*

¶19 In addition to the statutes already examined, other exemption statutes in Washington support the claim that the LEOFF exemptions do not continue once pension funds are deposited into the personal account of the beneficiary. First, the personal property exemption statute, which lists

---

[11] Ohio is an exception to the general consensus. The state courts there have held, even where the statutory language is somewhat ambiguous, that "statutorily exempt funds do not lose their exempt status by voluntary deposit into a checking account, as long as the source of the exempt funds is known or is reasonably traceable." *Haggerty v. George*, No. 00-C.A.-86, 2001-Ohio-3481, 2001 WL 1647216, 2001 Ohio App. LEXIS 5799, at *5 (2001) (unpublished) (citing *Daugherty v. Cent. Trust Co. of Ne. Ohio, NA*, 28 Ohio St. 3d 441, 504 N.E.2d 1100 (1986)). However, Ohio's statutory scheme is different from our own. There, exempt funds are expressly listed under "*property* exempt from execution, garnishment, attachment, or sale." OHIO REV. CODE ANN. § 2329.66(A) (emphasis added). In Washington, however, the list of exempt property is separated from the pension exemption statutes. *Compare* RCW 6.15.010, *with* RCW 6.15.020. West Virginia has similarly held that placement of funds in a bank does not strip them of their protected character. *See Billingslea v. Tartell*, 127 W. Va. 750, 759-60, 35 S.E.2d 89 (1945).

[12] The dissent gives a long list of cases purportedly holding that the "exemption status of money is not destroyed upon its deposit in a bank." Dissent at 778 n.16. Those cases are distinguishable because all but one of them interpret statutes that do not use the ambiguous language used by the Washington Legislature. Moreover, none of those cases address circumstances like those here, where another state exemption statute clearly and unambiguously exempts funds after deposit.

personal items exempt from attachment, does not mention money from retirement benefits.[13] RCW 6.15.010.

¶20 Second, the statute establishing the form that must be served as notice of garnishment to a debtor does not mention state pensions of any kind. The codified form in part tells the debtor what funds in a bank account may be claimed as exempt:

> If the garnishee is a bank or other institution with which you have an account in which you have deposited benefits such as Temporary Assistance for Needy Families, Supplemental Security Income (SSI), Social Security, veterans' benefits, unemployment compensation, or a United States pension, you may claim the account as fully exempt if you have deposited only such benefit funds in the account.

RCW 6.27.140(1). None of the funds mentioned include any state pensions. Moreover, everything on the list is related to a federal program, which accords with the unambiguous statutory exemption of federal pension money even after deposit. *See* RCW 6.15.020(2).

¶21 We emphasize that the legislature may expressly extend exemption protection to state pension funds after they come into the personal possession of the beneficiary. But here the legislature had a clear blueprint for express language that would grant pension moneys such protection. Federal benefits are exempt "whether the same be in the actual possession of [the beneficiary] or be deposited or loaned." RCW 6.15.020(2). That language has been in place for well over a century. LAWS OF 1890, § 1, at 88. The legislature chose to use different language for protection of state retirement benefits, granting only a "right" to the benefits. *E.g.*, RCW 41.26.053(1) (LEOFF exemption statute); RCW 41.40.052(1) (PERS exemption statute). Other related exemption statutes similarly contain no indication

---

[13] The statute lists "personal property [that shall] be exempt from execution, attachment, and garnishment." RCW 6.15.010(1). It includes items such as "wearing apparel," "private libraries," and "family pictures and keepsakes." RCW 6.15.010(1)(a), (b).

that the state benefits exemptions continue beyond the point when the State disburses the funds.[14] Federal and state case law interpreting similar statutes in other jurisdictions have required express language for such heightened protection, especially where other statutes in the same jurisdiction explicitly and unambiguously grant that protection. We recognize the general principle that exemption statutes are to be liberally construed. *Elliott*, 74 Wn.2d at 620. But we decline to read into the statute language the legislature has omitted, whether intentionally or inadvertently, unless it is required to make the statute rational or to effectuate the clear intent of the legislature. *See State v. Taylor*, 97 Wn.2d 724, 728-29, 649 P.2d 633 (1982). We hold that absent express statutory language to the contrary, Copland's LEOFF pension is not exempt from garnishment once it has been deposited into his personal account.

### EARNINGS EXEMPTIONS

¶22 Finally, Copland argues that even if his funds are not exempt once placed in his personal account, he is entitled to an earnings exemption under chapter 6.27 RCW. RCW 6.27.010(1) defines "earnings" as "compensation paid or payable to an individual for personal services, whether denominated as wages, salary, commission, bonus, or otherwise . . . includ[ing] periodic payments pursuant to a nongovernmental pension or retirement program." Since

---

[14] One exemption statute in Washington contains the "paid or payable" language found by the United States Supreme Court in *Philpott* to protect funds after disbursement to the beneficiary in the context of Social Security. *Compare* RCW 41.24.240 (volunteer fire fighter and reserve officer pensions), *with Philpott*, 409 U.S. at 415 n.3, 416-17. As noted above, all other exemption statutes are written in substantially similar language exempting either the right to "a retirement allowance" or to the "allowance itself" and do not contain the phrase "paid or payable." *E.g.*, RCW 2.10.180 (judicial pensions); RCW 41.26.053 (LEOFF); RCW 41.28.200 (public employees in certain first-class cities); RCW 41.32.052 (teacher pensions); RCW 41.37.090 (public safety employees pensions); RCW 41.40.052 (PERS). Neither the statute nor the legislative history offers any reason why the legislature would provide greater protection to volunteer fire fighters' and reserve officers' pensions than to full time fire fighting and law enforcement employees, or other state and local government employees.

Copland's pension is a state pension, he cannot claim it as earnings. Any other interpretation is contrary to the plain language of the statute and leads to absurd results. The statute by its terms applies only to "a *nongovernmental* pension." RCW 6.27.010(1) (emphasis added). In addition, "earnings" can be partially garnished while still in the hands of the employer, before it reaches the employee debtor. RCW 6.27.150(4). But the state pension exemption statutes plainly prohibit any garnishment at all of pension funds while still in the hands of the State. *E.g.*, RCW 41.40-.052. Thus Copland's state pension cannot be earnings.[15]

## Conclusion

¶23 Washington has one statute that exempts a beneficiary's money "whether [it] be in the actual possession of such person or be deposited or loaned." RCW 6.15.020(2). Other exemption statutes exempt only "[t]he right . . . to a . . . retirement allowance." RCW 6.15.020(3). The survey of case law and the plain language in the LEOFF and related exemption statutes indicate that the latter statutes exempt funds before they are given into the hands of the beneficiary, but not after receipt. We hold that the LEOFF exemption statute does not exempt retirement funds from garnishment after they have been paid to the retiree. If the legislature wants to give such a privilege to police officers and fire fighters, or indeed to any state employee, it must say so with the same unequivocal language used in the federal pensions exemption statute. Copland's right to the retirement allowance itself was not disturbed—the "allowance itself" was deposited into his personal checking account. At that point, his right was satisfied and does not

---

[15] The word "nongovernmental" was inserted in 2003. Laws of 2003, ch. 222, § 16. According to the House Bill Report, it was added for clarity in light of the fact that government pensions are not subject to garnishment, at least while still in the hands of the State. *See* H.B. Rep. on Substitute S.B. 5592, 58th Leg., Reg. Sess. (Wash. 2003).

extend so far as to provide a permanent shield from all his debts. Moreover, Copland's pension moneys are not earnings and are therefore not entitled to any earnings exemption. The trial court is affirmed, and the case remanded for further proceedings consistent with this opinion.

C. JOHNSON, J.M. JOHNSON, and WIGGINS, JJ., and ALEXANDER, J. PRO TEM., concur.

¶24 STEPHENS, J. (dissenting) — This case concerns RCW 41.26.053, the antigarnishment provision of the Washington Law Enforcement Officers' and Firefighters' Retirement System Act (LEOFF or Act). The question presented is whether LEOFF benefits lose their exempt status under RCW 41.26.053 upon being deposited into the beneficiary's personal bank account. The majority holds the exempt status evaporates the moment the benefit is paid to the beneficiary. This holding frustrates the entire purpose and policy of the Act. The Act is designed to safeguard a degree of economic security for the pensioner and dependent family members. The antigarnishment provision is critical to achieving the legislative purpose. Because the majority places a construction upon RCW 41.26.053 that runs contrary to the logic, letter, and spirit of the Act, I respectfully dissent.

GOVERNING PRINCIPLES OF INTERPRETATION

¶25 Our paramount duty in interpreting a statute is to ascertain and give effect to the intent of the legislature. *State v. Johnson*, 119 Wn.2d 167, 172, 829 P.2d 1082 (1992) (citing *City of Yakima v. Int'l Ass'n of Fire Fighters, AFL-CIO, Local 469*, 117 Wn.2d 655, 669, 818 P.2d 1076 (1991)). We interpret each statute in light of the entire statutory scheme. *Christensen v. Ellsworth*, 162 Wn.2d 365, 373, 173 P.3d 228 (2007) (citing *Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 9-12, 43 P.3d 4 (2002)). And

where the legislature has prefaced an enactment with a declaration of purpose, the declaration serves "as an important guide in determining the intended effect of the operative sections." *Hearst Corp. v. Hoppe*, 90 Wn.2d 123, 128, 580 P.2d 246 (1978) (citing *Hartman v. Wash. State Game Comm'n*, 85 Wn.2d 176, 179, 532 P.2d 614 (1975)). If an examination of the operative section at issue leaves "alternative interpretations . . . possible, the one that best advances the overall legislative purpose should be adopted." *Anderson v. Morris*, 87 Wn.2d 706, 716, 558 P.2d 155 (1976).

¶26 Proper interpretation of RCW 41.26.053 begins with the rule "that pension legislation must be liberally construed most strongly in favor of the beneficiaries." *Hanson v. City of Seattle*, 80 Wn.2d 242, 247, 493 P.2d 775 (1972). Similarly, exemption statutes require liberal construction so their underlying intent and purpose may be given effect. *In re Elliott*, 74 Wn.2d 600, 620, 446 P.2d 347 (1968) (citing *N. Sav. & Loan Ass'n v. Kneisley*, 193 Wash. 372, 76 P.2d 297 (1938)). Liberal construction in favor of pension beneficiaries is particularly important here because we are dealing with an exemption statute contained in pension legislation.

## A TEXTUAL EXAMINATION

¶27 The antigarnishment provision, RCW 41.26.053(1), states:

Subject to subsections (2) and (3) of this section, the right of a person to a retirement allowance, disability allowance, or death benefit, to the return of accumulated contributions, the retirement, disability or death allowance itself, any optional benefit, any other right accrued or accruing to any person under the provisions of this chapter, and the moneys in the fund created under this chapter, are hereby exempt from any state, county, municipal, or other local tax and shall not be subject to execution, garnishment, attachment, the operation of bankruptcy or insolvency laws, or any other process of law whatsoever, and shall be unassignable.

The statute is written in broad terms. The text shows the legislature exempted both pension money in the fund and pension money after distribution from any process of law whatsoever.

¶28 Germane to this case, the statute exempts (1) "the right of a person to a retirement allowance," (2) "the retirement . . . allowance itself," (3) "*and* the moneys in the fund created under [the Act]." RCW 41.26.053(1) (emphasis added). This last clause—"and moneys in the fund"—refers to pension money not yet received by a beneficiary. By including this clause, the legislature distinguished pension money remaining "in the fund," and therefore not yet received, from the other exempt items articulated in the statute. In light of this legislative distinction, the phrases "right . . . to a retirement allowance" and "the retirement . . . allowance itself" must be read as referring not only to undistributed pension money but also to pension money received by the beneficiary. *See Whatcom County v. City of Bellingham*, 128 Wn.2d 537, 546, 909 P.2d 1303 (1996) ("Statutes must be interpreted and construed so that all the language used is given effect, with no portion rendered meaningless or superfluous.").

¶29 This reading is bolstered by the legislature's use of the word "allowance" when referring to the retirement benefit. The word "allowance" means "[a] share or portion, esp. of money that is assigned or granted." BLACK'S LAW DICTIONARY 89 (8th ed. 2009). Because words used in a statute are given their ordinary meaning, *State v. Smith*, 117 Wn.2d 263, 271, 814 P.2d 652 (1991), the word "allowance" in RCW 41.26.053(1) can mean nothing less than "a share of money." Thus, the legislature exempted the share of money itself, whether or not it has been received by the beneficiary. Indeed, to read the statute otherwise, as the majority does, flouts well-established principles because it makes most of the exemptions enumerated in the statute redundant. *See Whatcom County*, 128 Wn.2d at 546 ("Statutes must be interpreted and construed so that all the

language used is given effect, with no portion rendered meaningless or superfluous."). The pension money *itself* is what the statute shields from any legal process whatsoever. The money is protected both while it is in government hands and after it has been disbursed to the pensioner. This reading of the statute best effectuates the policies and purposes of the Act as a whole.

## THE OVERARCHING PURPOSE OF THE ACT

¶30 The overarching legislative purpose of the Act is found at RCW 41.26.020:

> The purpose of this chapter is to provide for an actuarial reserve system for the payment of death, disability, and retirement benefits to law enforcement officers and firefighters, and to beneficiaries of such employees, *thereby enabling such employees to provide for themselves and their dependents* in case of disability or death, and effecting a system of retirement from active duty.

(Emphasis added.)

¶31 By these words, the legislature made plain that the principal objective of the Act is to ensure the pensioner and dependent family members are provided for when the pensioner enters retirement or his or her years of productivity are cut short by disability or death. The declared policy serves as the key to ascertaining the meaning of the antigarnishment provision. By shielding the pensioner and dependents from claims of creditors, RCW 41.26.053(1) operates as a critical mechanism to achieving the overall legislative purpose.

¶32 Courts have long recognized the purpose of safeguarding a pensioner's family from want as the animating force behind state antigarnishment statutes and have interpreted them in this light. So powerful is the policy, a considerable majority of courts have carved out a common law exception to pension antigarnishment statutes to accommodate claims for child support and spousal mainte-

nance. *See, e.g., Faus v. Faus*, 319 N.W.2d 408 (Minn. 1982); *Fischer v. Fischer*, 13 N.J. 162, 98 A.2d 568 (1953); *Mahone v. Mahone*, 213 Kan. 346, 517 P.2d 131 (1973); *Collida v. Collida*, 546 S.W.2d 708 (Tex. Civ. App. 1977); *Saunders v. Saunders*, 243 Wis. 94, 9 N.W.2d 629 (1943); *Hodson v. N.Y.C. Emps.' Ret. Sys.*, 243 A.D. 480, 278 N.Y.S. 16 (1935); *Courtney v. Courtney*, 251 Wis. 443, 29 N.W.2d 759 (1947). Indeed, "[e]ven where the exemption provision is absolute on its face, it has been held that exemptions contained in pension statutes are inapplicable to a claim for alimony or child support." *Faus*, 319 N.W.2d at 411. As one court has explained:

> Underlying these decisions is the reasoning that the funds involved, pension funds and disability insurance, are created for the protection, not only of the employee or insured, but for the protection of his family. Similarly, the purpose of exemptions is to relieve the person exempted from the pressure of claims that are hostile to his and his dependents' essential needs.

*Courtney*, 29 N.W.2d at 762.

¶33 These courts have chosen to animate the spirit of the statute, understood from its context, despite any discerned inartfulness in its drafting. *See, e.g., Mahone*, 517 P.2d at 134 ("we have applied the principle that a statute is not to be given an arbitrary construction, according to the strict letter, but one that will advance the sense and meaning fairly deducible from the context"). "The spirit of a statute gives character and meaning to particular terms. The reason of the law, i.e., the motive which led to the making of it, is one of the most certain means of establishing the true sense." *Fischer*, 98 A.2d at 571.

¶34 The overriding policy of the Act is reflected in our own legislature's decision to except maintenance and child support from the scope of the antigarnishment provision. *See* RCW 41.26.053(1)-(3). By excepting such claims, the legislature made clear that RCW 41.26.053(1) is not intended to function at odds with the declared purpose of the

Act but operates consonant with the spirit of the Act, as set forth in the legislative declaration. If the statute functions to jeopardize the needs of the petitioner's dependents—as the majority allows—the purpose of the Act is undermined.

¶35 In holding that Walter Copland's pension money, though exempt from the reach of creditors while in the hands of the government, becomes subject to seizure the moment it is paid, the majority reduces the Act's protection to a meaningless formality, easily circumvented by creditors. Courts have long recognized the problem with such an interpretation. In *Surace v. Danna*, 248 N.Y. 18, 161 N.E. 315 (1928), New York's court of last resort addressed the question whether a state antigarnishment statute, which exempted "benefits due under this chapter," continued to exempt the benefits after being paid to the beneficiary. Speaking for the court, Justice Cardozo noted:

> By concession the moneys due under the award would have been exempt from the pursuit of creditors before they reached the judgment debtor. The argument is, however, that they became subject to seizure the instant they were paid. If this is so, the exemption is next to futile. All that a creditor has to do is to obtain an order in supplementary proceedings, containing, like the order in this proceeding, the usual provision restraining the judgment debtor from making any transfer or disposition of his property until further directions in the premises. Then, as the installments of an award are paid, the injunction will tie them up. They may be appropriated to the last dollar in satisfaction of an ancient debt. They will no longer be a fund for the support of the indigent and helpless.
>
> So narrow a construction thwarts the purpose of the statute.

*Id.* at 20.

¶36 It is telling that the majority is completely silent as to LEOFF's declaration of purpose. Ignoring the purpose of the Act, the majority incorrectly assumes that RCW 41.26-.053(1) embodies a legislative intent to protect only the retirement fund, specifically those who manage the retirement system, from the administrative burdens of execution

and garnishment. While this is no doubt part of what the statute accomplishes, to conclude it does nothing more puts the majority at odds with the broad and clearly expressed declaration set forth in RCW 41.26.020. The legislature made clear the ultimate aim of the Act is to enable law enforcement officers and firefighters to provide for themselves and their dependents, not to ease administrative burdens. We must give effect to the intent of the legislature by liberally construing RCW 41.26.053(1) to further the declared policy. While the majority gives lip service to liberal construction, the rule it announces in fact *strictly* construes the LEOFF exemption statute. *See* majority at 765 ("We hold that absent express statutory language to the contrary, Copland's LEOFF pension is not exempt from garnishment once it has been deposited into his personal account.").

## CASE LAW

¶37 The majority believes the legislature needed to use language such as that found in certain federal antigarnishment statutes if it wanted to protect retirement funds from creditors. *See* majority at 764-65. In addition to disregarding liberal construction, this holding is founded on an erroneous reading of cases that have examined the issue. According to the majority, there exists a general consensus among courts that "some unambiguous reference to money actually paid to or in the possession of the pensioner is necessary in order to find that pension funds retain their exempt status postdistribution." *Id.* at 760. Not true. Decisions addressing the issue do not turn on the incantation of magic words, but rather ground their analysis in legislative intent reflected in the breadth of the statute.

¶38 The majority observes that "in the federal courts, the language in the Social Security Act prohibiting garnishment of ' "the moneys paid or payable" ' to a beneficiary has been held protected even after deposit." *Id.* (quoting

*Philpott v. Essex County Welfare Bd.*, 409 U.S. 413, 415-17, 93 S. Ct. 590, 34 L. Ed. 2d 608 (1973) (quoting Social Security Act of 1935, ch. 531, § 208, 49 Stat. 620, 625 (1935))). It also notes that "[s]imilarly, language in the World War Veterans' Act of 1924 [also known as "Veterans' Benefits Act"] that funds were exempt ' "either before or after receipt by the beneficiary" ' has been held to protect funds postdistribution." *Id.* at 760-61 (footnote omitted) (quoting *Porter v. Aetna Cas. & Sur. Co.*, 370 U.S. 159, 160-62 & n.1, 82 S. Ct. 1231, 8 L. Ed. 2d 407 (1962) (quoting World War Veterans' Act of 1924, ch. 510, § 3, 49 Stat. 607, 609 (1935))). The majority then contrasts the Social Security Act and the Veterans' Benefits Act with the antialienation statute of the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1056(d)(1), which courts have largely held does not protect funds postdistribution. *Id.* at 761.

¶39 The majority, however, fails to note the unique narrowness of ERISA's language as compared to other acts. Even the one cited federal decision that supports the majority's view recognizes the language of ERISA's antialienation statute was not "written broadly," as are other federal provisions, but clearly "governs only the plan itself." *Hoult v. Hoult*, 373 F.3d 47, 54-55 (1st Cir. 2004). The majority gleans the wrong rule from these cases. The general rule is not that "some unambiguous reference to money actually paid to or in the possession of the pensioner is necessary in order to find that pension funds retain their exempt status postdistribution." Majority at 760. Instead, courts have determined that pension funds retain their exempt status postdistribution when the language of the statute shows the exempt status attaches to the benefit itself as opposed to the benefit only while held by the government. *See, e.g.*, *Waggoner v. Games Sales Co.*, 288 Ark. 179, 702 S.W.2d 808, 809 (1986); *Philpott*, 409 U.S. at 415-17.

¶40 This principle is illuminated by examining what the majority overlooks. Although it discusses the antigarnish-

ment statutes of the Social Security Act, the Veterans' Benefits Act, and ERISA, the majority fails to mention the antigarnishment statutes of other similar federal schemes. The Civil Service Retirement Act, 5 U.S.C. § 8346(a), for example, provides that "[t]he money mentioned by this subchapter is not assignable, either in law or equity, . . . or subject to execution, levy, attachment, garnishment, or other legal process." Though § 8346(a) does not contain the explicit language found in the antigarnishment statutes of the Social Security Act and the Veterans' Benefits Act, a majority of courts recognize its protections continue to apply even after the money is received by the beneficiary. *See State ex rel. Nixon v. McClure*, 969 S.W.2d 801, 806 (Mo. Ct. App. 1998) ("A majority of courts considering the issue hold that the protection afforded by § 8346(a) continues to apply to the funds even after they are in possession of the payee."); *Tom v. First Am. Credit Union*, 151 F.3d 1289, 1293-94 (10th Cir. 1998) ("Although not as precisely drafted as [42 U.S.C.] § 407, the broad language of § 8346 offers no hint that its protections are any narrower than those afforded to Social Security payments or that Congress intended to treat future payments any differently than payments already received."); *In re Anderson*, 410 B.R. 289 (Bankr. W.D. Mo. 2009) (same); *Waggoner*, 702 S.W.2d at 809 (noting that only "[t]wo courts have reached the opposite result").

¶41 These courts properly focus on the breadth of an antialienation provision, not whether its wording explicitly mentions benefits postdistribution. The reasoning of the *Waggoner* court is instructive:

> By this clearly expressed provision Congress makes the exemption applicable to "the money mentioned in this subchapter." The statute, unlike some others, does not base the exemption upon whether the government holds the money. Under this broad grant of immunity, the exemption attached to the money itself and, when the money was paid to the recipient, it was free from garnishment by a judgment creditor.

*Id.*

¶42 The United States Supreme Court's decision in *Hisquierdo v. Hisquierdo*, 439 U.S. 572, 99 S. Ct. 802, 59 L. Ed. 2d 1 (1979), endorses a similar approach with respect to the Railroad Retirement Act's antigarnishment provision, 45 U.S.C. § 231m. This statute prohibits annuity funds from being subject to "garnishment, attachment, or other legal process under any circumstances whatsoever." 45 U.S.C. § 231m(a). The Supreme Court made clear the provision continues in force even after the funds are received by the beneficiary. *Hisquierdo*, 439 U.S. at 583. The Court noted that any other holding would "run[ ] contrary to the language and purpose of § 231m and would mechanically deprive petitioner of a portion of the benefit Congress in § 231d(c)(3), indicated was designed for him alone." *Id.* Speaking to the breadth of the statute, the Court observed that "[s]ection 231m goes far beyond garnishment. It states that the annuity shall not be subject to any 'legal process under any circumstances whatsoever . . . .'" *Id.* at 586 (quoting § 231m(a)).

¶43 The majority also cites a handful of decisions interpreting antigarnishment provisions of other states for the proposition that explicit language is required to exempt a benefit after it has been received by the beneficiary. Yet, even some of those cases lend support to the view that proper analysis hinges not so much on whether there exists specific language proscribing garnishment postdistribution, but on whether the language of the statute is sufficiently comprehensive to evidence an intent to protect the money both pre- and postdistribution. *See, e.g., Whitwood, Inc. v. S. Blvd. Prop. Mgmt. Co.*, 265 Mich. App. 651, 701 N.W.2d 747, 749 (2005) (noting that the language of the state antigarnishment statute at issue was "less comprehensive" than that contained in the federal Social Security Act because the state statute protected only the "retiree's *right* to a benefit"); *In re Lawrence*, 219 B.R. 786, 792-93 (Bankr. E.D. Tenn. 1998) (noting the statute at issue was

"fundamentally different from . . . other Tennessee exemption statutes" because it did "not contain similar broad language," but "merely limit[ed] . . . the amount of disposable earnings that may be subjected to garnishment").

¶44 *In re Miller*, 435 B.R. 561 (Bankr. N.D. Ind. 2010), provides perhaps the strongest support for the majority's position. But there, the court characterized the issue as whether Indiana's exemption statute was "broad enough" to protect the pension funds after they came into the possession of the beneficiary. *Id.* at 563. The court held it was not because the property protected under the statute was only the " *'interest . . .* that the debtor has *in a retirement plan or fund.'* " *Id.* at 564 (alteration in original). The scope of the state exemption statute was too narrow. By its clear language, the statute was limited to money " 'in a retirement plan.' " *Id.*

¶45 The *Miller* court did note that "the legislature can only grant exemptions in proceeds *by explicitly stating that the proceeds are exempt.*" *Id.* at 567 n.6. But, this observation must be read in light of Indiana's particular history of interpreting government exemption statutes. Courts in Indiana long ago established the common law rule that government exemption statutes do not protect money postdistribution. *See id.*; *Sohl v. Wainwright Trust Co.*, 76 Ind. App. 198, 130 N.E. 282 (1921); *Faurote v. Carr*, 108 Ind. 123, 9 N.E. 350 (1886). It appears the rule was rooted in cases interpreting a 19th century federal exemption statute, U.S. Rev. Stat. § 4747 (1873), 18 pt. 1 Stat. 931 (1875), *recodified at* 44 pt. 1 Stat. 1194, § 51, *repealed by* Act of Aug. 12, 1935, § 3, 49 Stat. 609. *See Cavanaugh v. Smith*, 84 Ind. 380 (1882); *see also Faurote*, 108 Ind. 123. This statute provided, "No sum of money due, or to become due, to any pensioner, shall be liable to attachment, levy, or seizure by or under any legal or equitable process whatever, whether the same remains with the pension office, or any officer or agent thereof, or is in course of

transmission to the pensioner entitled thereto, but shall inure wholly to the benefit of such pensioner." U.S. Rev. Stat. § 4747. Because the particular words of this statute— "money due, or to become due"—clearly limited the exemption to an undelivered sum of money, the courts held the exemption was inapplicable once the money had been transmitted to the pensioner. *See, e.g., Cavanaugh*, 84 Ind. at 386. Moreover, the purpose of the statute was narrow: "to prevent the machinery of government from being stopped by a withdrawal of compensation from those charged with the administration of government affairs." *Id*. It was in this context the Indiana legislature developed a practice of expressly distinguishing between pre- and postdistribution scenarios. *See In re Miller*, 435 B.R. at 567 n.6.

¶46 Washington's history is dissimilar. Before today, our legislature had no need to unequivocally distinguish between pre- and postdistribution in its antigarnishment statutes. It is therefore inappropriate to construe them by looking to how some courts in other jurisdictions have interpreted antigarnishment statutes of states that have historically made the distinction.[16]

¶47 We should focus on the fact that RCW 41.26.053 is worded similarly to provisions that have been recognized as sufficiently comprehensive to protect benefits both pre- and postdistribution. Indeed, RCW 41.26.053 is arguably stronger than the Railroad Retirement Act's antigarnishment provision, which prohibits annuity funds from being subject to "garnishment, attachment, or other legal process under

---

[16] At any rate, in contrast to *Miller*, the weight of authority holds, without requiring unequivocal language, that the exemption status of money is not destroyed upon its deposit in a bank. *See, e.g., J.M. v. Hobbs*, 281 Neb. 539, 797 N.W.2d 227 (2011); Annotation, *Deposit of Exempt Funds as Affecting Debtor's Exemption*, 67 A.L.R. 1203 (1930) (citing cases); *Kruger v. Wells Fargo Bank*, 11 Cal. 3d 352, 521 P.2d 441, 113 Cal. Rptr. 449 (1974); *Surace*, 161 N.E. 315; *In re Hunt*, 250 B.R. 482 (Bankr. E.D.N.Y. 2000); *Waggoner*, 702 S.W.2d 808; *In re Bresnahan*, 183 B.R. 506 (Bankr. S.D. Ohio 1995); *Sears, Roebuck & Co. v. Harris*, 1993 OK CIV APP 99, 854 P.2d 921; *State ex rel. Nixon*, 969 S.W.2d 801; *Tom v. First Am. Credit Union*, 151 F.3d 1289 (10th Cir. 1998); *United States v. Smith*, 47 F.3d 681 (4th Cir. 1995); *In re Williams*, 171 B.R. 451 (Bankr. D.N.H. 1994).

any circumstances whatsoever." 45 U.S.C. § 231m(a). Also, RCW 41.26.053 is more comprehensively worded than the antigarnishment statute contained in the Civil Service Retirement Act. As noted, both have been consistently construed to protect benefits after distribution. Unlike some other statutes, RCW 41.26.053 does not base the exemption upon whether the government holds the money. Under the statute's broad grant of immunity, the exemption attaches to the retirement allowance itself and, when the allowance is paid to the recipient, it is shielded from any process of law whatsoever.

¶48 The recent case of *J.M. v. Hobbs*, 281 Neb. 539, 797 N.W.2d 227 (2011), is particularly instructive in achieving a proper statutory construction. In that case, the Supreme Court of Nebraska addressed the issue whether the antigarnishment provision of its State Patrol Retirement Act (NEB. REV. STAT. §§ 81-2014 to 81-2041) continued to exempt benefits after they had been received by the beneficiary. *J.M.*, 797 N.W.2d 227. Like this case, that case involved a civil judgment creditor. Billy Hobbs was a former state trooper who was convicted of sexually assaulting a minor child. *Id.* at 228. The guardian of the minor child, J.M., brought suit on the child's behalf and won a substantial civil judgment. *Id.* The guardian sought to execute the judgment against Hobbs' retirement pension. *Id.* The court was asked to decide whether Hobbs' pension benefits were exempt from execution, even after the funds passed into his hands. *Id.* at 228-29. The Nebraska antigarnishment statute provides:

> "All annuities or benefits which any person shall be entitled to receive under [the Act] shall not be subject to garnishment, attachment, levy, the operation of bankruptcy or insolvency laws, or any other process of law whatsoever and shall not be assignable except to the extent that such annuities or benefits are subject to a qualified domestic relations order under the Spousal Pension Rights Act."

*Id.* at 229 (quoting NEB. REV. STAT. § 81-2032).

¶49 The court rejected J.M.'s argument that the statute draws an implicit distinction between the funds a beneficiary " 'shall be entitled to receive' " and funds the beneficiary already has received. *Id.* (quoting NEB. REV. STAT. § 81-2032) J.M. argued the distinction was warranted because the statute uses the words " 'annuities' " and " 'benefits,' " which J.M. alleged "refer to a right to payment, not to the payment or proceeds themselves." *Id.* The court reasoned that "[t]here is simply no merit to J.M.'s argument that 'annuities' and 'benefits' in [the statute] refer to something other than payments of money." *Id.* at 230. The court, therefore, rejected the notion that the Nebraska legislature intended only to "protect the Nebraska State Patrol Retirement System from having to deal with the administrative burdens of execution and garnishment," and not to protect the money received by the beneficiary of the act. *Id.* at 229. In respect to whether the pension money retained its exempt character upon passing to the beneficiary, the court reasoned that the presence or absence of specific language referencing postdistribution benefits was unimportant: "[T]his distinction has been consistently rejected by courts discussing statutes, such as § 81-2032, that do not contain such language. The language of § 81-2032 is still clearly intended to protect benefits under the Act from legal process." *Id.* at 230 (footnote omitted).

¶50 Acknowledging that antialienation provisions may sometimes serve to cut off possible avenues of recovery for victims, the court noted that "courts have held that antiattachment provisions are to be given effect even where a creditor is attempting to collect restitution for a criminal act, or a tort judgment." *Id.* at 230-31 (citing *Guidry v. Sheet Metal Workers Nat'l Pension Fund*, 493 U.S. 365, 110 S. Ct. 680, 107 L. Ed. 2d 782 (1990); *Higgins v. Beyer*, 293 F.3d 683 (3d Cir. 2002); *Whitter v. Hall*, 260 Kan. 99, 917 P.2d 854 (1996); *Younger v. Mitchell*, 245 Kan. 204, 777 P.2d 789 (1989)). The court looked to the United States Supreme Court, which has explained that "it is not appropriate for a

court to approve any generalized equitable exception to an antigarnishment provision, even for criminal misconduct, despite a 'natural distaste for the result.'" *Id.* at 231 (quoting *Guidry*, 493 U.S. at 377). An antigarnishment provision

> "reflects a considered congressional policy choice, a decision to safeguard a stream of income for pensioners (and their dependents, who may be, and perhaps usually are, blameless), even if that decision prevents others from securing relief for the wrongs done them. If exceptions to this policy are to be made, it is for Congress to undertake that task.
>
> "As a general matter, courts should be loath to announce equitable exceptions to legislative requirements or prohibitions that are unqualified by the statutory text. The creation of such exceptions, in our view, would be especially problematic in the context of an antigarnishment provision. Such a provision acts, by definition, to hinder the collection of a lawful debt."

*Id.* (quoting *Guidry*, 493 U.S. at 376-77). The Nebraska court correctly held the antigarnishment statute at issue precluded the relief sought by J.M. *Id.* at 232. We should similarly construe RCW 41.26.053 consistent with its broad language and clear statutory purpose and hold the pension benefits at issue are not subject to garnishment.

¶51 As a final note, this liberal construction avoids the conundrum the majority's view creates but cannot explain. In a footnote, the majority acknowledges that the pension exemption statute for volunteer fire fighters and reserve officers is worded differently from the LEOFF statute, in that it references benefits " 'paid or payable.' " Majority at 765 n.14. Because this language is all-important under the majority's strict construction, the majority is left to conclude that volunteer fire fighters and reserve officers have been granted greater protection than regularly employed fire fighters, law enforcement officers, and other state and local government workers. *Id.* Yet, the majority recognizes that "[n]either the statute nor the legislative history offers any reason why the legislature would provide greater

protection . . . ." *Id.* In my view, there is no reason. The legislature has not treated these employees differently because it has not required the magic "paid or payable" language to effectuate the clear purpose of antigarnishment provisions.[17] Rather than looking for significance in language variations where none was intended, we should read the LEOFF antigarnishment provision with a steady eye on its important purpose.

## CONCLUSION

¶52 The purpose of LEOFF is to preserve pension benefits so that employees may provide for themselves and dependent family members. RCW 41.26.053 must be liberally construed to achieve this important purpose. The majority reduces the antigarnishment provision to a meaningless protection for pensioners when it holds that benefits may be attached the instant the money leaves the government's hands and passes to the pensioner. Consistent with the statutory language and its clear purpose, and guided by the weight of judicial authority interpreting similar stat-

---

[17] The majority makes a similar error when it relies on RCW 6.15.020 to conclude the pension money here is not as protected as federal pension money. Majority at 758. It identifies a simple contrast in the statute's language dating from 1890 in subsection (2), applicable to federal benefits received by Washington citizens, and language crafted in 1987 in subsection (3), applicable to private employee pension plans. What gets lost in this casual reference to RCW 6.15.020 is the purpose of that statute. It was enacted pursuant to authority granted in the United States Bankruptcy Code, to strengthen the exempt status of both public' and private pension plans in response to changes in federal bankruptcy law. *See* RCW 6.15.020(1); FINAL LEGISLATIVE REPORT, 50th Leg., at 193-94 (Wash. 1987). (explaining this purpose to restore prior protections to private plans under ERISA). Importantly, the legislature recognized when it added subsection (2) that it was equalizing the treatment of similar plans, not distinguishing between them, as the majority suggests. In fact, the 1987 *Final Legislative Report* emphasized that "[c]urrent state law protects the pension benefits of federal and state employees from creditors, whether in or outside bankruptcy." FINAL LEGISLATIVE REPORT, 50th Leg., at 193. The importance of RCW 6.15.020 has nothing to do with the proper interpretation of RCW 41.26.053, but rather resides in its interface with federal bankruptcy law—and, not inconsequentially, federal tax law. *See* RCW 6.15.020(3)-(5) (referencing Internal Revenue Code provisions). As amicus curiae Washington State Patrol Troopers Association aptly observe, "Judicial erosion of Washington's antialienation statutes endangers the tax exempt status of Washington's public pension plans." Br. of Amicus Curiae at 13.

utes, I would hold that benefits paid under the Act retain their exempt status under RCW 41.26.053 after being deposited into the beneficiary's personal bank account. I respectfully dissent.

MADSEN, C.J., and OWENS and FAIRHURST, JJ., concur with STEPHENS, J.

Reconsideration denied May 22, 2012.