[No. 12426-4. En Banc.]
Argued May 18, 2000. Decided September 14, 2000.

*In the Matter of the Disciplinary Proceeding Against* MICHAEL K. TASKER, *an Attorney at Law.*

558

*Rita L. Bender* (of *Skellenger, Bender, P.S.*), for Tasker.
*Joanne Abelson*, for the Bar Association.

SANDERS, J. — Attorney Michael Tasker appeals the determination of the Disciplinary Board of the Washington State Bar Association (WSBA) that he be disbarred for various violations of the Rules of Professional Conduct (RPC). At issue is whether an attorney who commingles funds in his client trust account and pays business and personal expenses out of the commingled account, but without intent to permanently deprive any clients of money, should be disbarred. We disagree with the WSBA that Tasker be disbarred, and instead impose a two-year suspension from the practice of law.

## FACTS

Michael Tasker was an agent of the Federal Bureau of Investigations prior to becoming a practicing attorney in

Bellingham, Washington. From 1982 until 1988, Mr. Tasker practiced law in a partnership with lawyer Dennis Hindman. After the dissolution of that partnership in 1988, he became a sole practitioner.

At about the same time his partnership dissolved in 1988, Tasker's marriage with then-wife Lynn Tasker (now Chamberlain) fell apart and resulted in hotly contested dissolution and child-support proceedings. The dissolution became final in May 1989, and Tasker's ex-wife was awarded child support, which Tasker failed to pay.[1] In June 1992, Chamberlain obtained a judgment for $41,063.24 in overdue support payments, and later secured judgments for amounts between $50,000 and $70,000. By late 1992, Tasker's personal and business accounts were garnished to pay overdue support obligations. This development interfered with the payment of expenses in his law office.

Tasker testified in a February 1994 proceeding that his office checking account was penniless and for two months he had been paying his office overhead out of his clients' trust account. This prompted the WSBA to order an audit of his trust account for the period October 1, 1992 to April 30, 1994. The audit occurred in May 1994. The report issued in October 1994.

The audit revealed that Tasker allowed earned income to remain in his trust account and beginning in May 1993, Tasker paid his office and personal expenses out of his trust account rather than first dispensing his earned income to his operating account before payment of personal expenses.

---

[1] Tasker's personal woes during this time, 1988-92, were dramatic. In addition to his law partnership crumbling, the ensuing litigation over the division of assets, and contentious dissolution proceedings with his wife, Tasker also suffered the loss of his mother, the placement of his father in a nursing home, two separate automobile accidents in which severe personal injuries were sustained, a brief and failed second marriage, a change of custody of his children, and a trial and retrial of a murder case that drained Tasker's financial and psychological resources. This personal tumult led the Disciplinary Board dissenter to remark that Tasker's "emotional wheels completely fell off," suggesting he had embarked on an "aberrant" course of misconduct that he subsequently righted. Clerk's Papers (CP) at 1051. The Disciplinary Board majority noted these facts but dismissed them noting "personal and emotional problems are not mitigating factors." CP at 1036.

From August 1993 until May 1994, Tasker used the commingled account for all of his business and personal financial transactions. He deposited his own funds into the trust account and commingled them with the client funds in the same account. The admitted purpose of the commingling was to avoid garnishment of funds in his personal and business accounts by the Office of Support Enforcement.

Although the trust account balance sometimes fell below that attributable to client funds, at no time did any client lose any money nor did Tasker, in the words of the hearing officer, intend "to permanently deprive his clients of their money." Clerk's Papers (CP) at 373 (Finding 67).

The hearing officer found Tasker knew "his client trust account was being used for his personal and business financial transactions." CP at 373 (Finding 66).

The WSBA audit showed that for most of the year between May 1993 and May 1994, the balance in Tasker's trust account was less than the amount which should have been held in trust, up to a deficit of $30,000 in August 1993. On several occasions during that year the trust account was overdrawn, although no checks were ever returned. The hearing officer found Tasker "had full knowledge of the requirements of RPC 1.14," concerning the management of trust accounts, and that Tasker "knew that he was doing more than simply commingling his funds with client funds. He knew that he was using client funds to meet his financial obligations." CP at 373-74 (Finding 67). Since 1994, WSBA and independent audits commissioned by Tasker demonstrate his office complied with proper trust accounting practices.

Between 1992 and 1994 several clients filed grievances against Tasker with the WSBA on various other matters. These less serious grievances, in addition to the trust account violation, formed the basis of the WSBA's formal complaint.

On February 24, 1998, the WSBA filed a 12-count formal complaint against Tasker covering seven separate griev-

ances. Shortly after filing an answer, Tasker stipulated to certain facts and misconduct, including:

- Misappropriation of client funds for use to pay personal and business expenses and commingling personal and client funds in violations of RPC 1.14 and 8.4(c);

- failing to provide clients with accurate billings regarding the services rendered on their behalf, or to supervise his staff with respect to providing clients with accurate billings, in violation of RPC 1.5, 1.14(b)(3), 5.3, and 8.4(c);

- applying to his fee $7,000 in bond proceeds due the parents of a client without their permission, in violation of RPC 1.14 and 8.4(c);

- failing to communicate with a client about the decision for a trial continuance, in violation of RPC 1.4;

- representing one client in a matter directly adverse to a current client without the client's written consent, in violation of RPC 1.7;

- failing to act diligently in representing a client, in violation of RPC 1.3;

- misrepresenting to a court that he had experience in class action litigation when such was arguably not the case, in violation of RPC 3.3(a); and

- failing to supervise his paralegal's issuance of a misleading communication through a press release, in violation of RPC 5.3.

CP at 8-22.

Despite the stipulation of facts and misconduct, Tasker asserted that he had not known many of the facts that formed the basis of the stipulated misconduct, but would take responsibility for the actions of others.

During a four-day sanction hearing, appointed hearing officer Timothy Esser investigated Tasker's mental state as well as mitigating and aggravating factors. Esser filed his Findings of Fact, Conclusions of Law, and Recommendation on November 17, 1998. Esser concluded Tasker intentionally commingled his funds with those of his clients to avoid payment of court-ordered child support, and knowingly

used client funds from the commingled account to pay personal and business expenses.

Finding disbarment the presumptive sanction under the ABA Standards for this violation, Esser nevertheless determined Tasker's sanction should be mitigated to a one-year suspension due to delay in prosecution by the WSBA and because disbarment would be disproportionate to other cases in which worse malefactors escaped with a suspension. As for the other acts of misconduct, the hearing officer found the presumptive sanctions were one reprimand and four admonitions. He dismissed two acts of stipulated conduct relating to the alleged misrepresentation of class action experience and the issuance of a press release about that class action lawsuit.

On November 18, 1998, the WSBA asked Esser to amend his findings because he did not address count 12 of the formal complaint, viz., Tasker's alleged unfitness to practice law. Esser then filed a supplemental finding that Tasker was fit to practice law.

The WSBA appealed Esser's conclusions and recommendations to the Disciplinary Board. Tasker did not appeal any of Esser's factual findings, conclusion, or recommendation of sanctions.

The Board issued a September 20, 1999 opinion adopting Esser's findings but modifying his conclusions and sanction recommendation to reflect the Board's nine-to-one determination that Tasker be disbarred for the trust account violations. The Board also reversed the hearing officer's dismissal of the two stipulated counts of misconduct,[2] and found the presumptive sanctions for Tasker's other violations to be one suspension, two reprimands, and three admonitions. The Board's decision was rendered over the vigorous dissent of member Leslie Weatherhead who ar-

---

[2] Tasker assigned error to the Board's reversal of the hearings officer's dismissal of these two charges relating to the class action complaint and press release discussed above. However because we resolve the more significant issue of the trust account violations sanction in Tasker's favor, it is not essential that we discuss this less significant issue in any depth.

gued disbarment was a disproportionate sanction in Tasker's case and that the Board majority's sanction recommendation seemed more retributive than rational.

## DISCUSSION

At the heart of the Disciplinary Board's disbarment recommendation is the hearing officer's finding that Tasker knowingly commingled personal funds in his trust account, knowingly used the trust account to pay personal expenses without client authorization, and intentionally violated the trust account rules to avoid payment of court-ordered child support—findings the Disciplinary Board unanimously adopted. However the Board departed from the hearing officer's recommended one-year suspension in favor of the presumptive ABA Standards sanction of disbarment, and the WSBA has vigorously defended the Board's departure.

The hearing officer deviated from the presumptive sanction based upon two mitigating factors and the disproportionality of disbarment to prior sanctions in similar cases. In mitigation the hearing officer considered the lengthy delay between auditing Tasker's trust account (1993-94) and bringing the disciplinary proceeding (1998) and Tasker's interim rehabilitation. However a majority of the Disciplinary Board voted nine-to-one to reverse the hearing officer's recommendation, opting for disbarment instead.

 This court does not lightly depart from the Board's recommendation; however it is not bound by it. RLD 2.1; *In re Discipline of Haskell*, 136 Wn.2d 300, 317, 962 P.2d 813 (1998). The Supreme Court retains the ultimate responsibility for determining the nature of an attorney's discipline. *Id.* (citing *In re Discipline of Espedal*, 82 Wn.2d 834, 838, 514 P.2d 518 (1973)). We adopt the Board's recommendation unless the court can articulate a specific reason to depart from it and we are persuaded the sanction is inappropriate based upon consideration of the following factors:

"1. The purposes of attorney discipline (sanction must pro-

tect the public and deter other attorneys from similar misconduct);

2. The proportionality of the sanction to the misconduct (sanction must not depart significantly from sanctions imposed in similar cases);

3. The effect of the sanction on the attorney (sanction must not be clearly excessive);

4. The record developed by the hearing panel (sanction must be fairly supported by the record and must not be based upon considerations not supported by the record); and

5. The extent of agreement among the members of the Board (sanction supported by unanimous recommendation will not be rejected in the absence of clear reasons)."

*In re Discipline of Haskell*, 136 Wn.2d at 317-18 (quoting *In re Discipline of Johnson*, 114 Wn.2d 737, 752, 790 P.2d 1227 (1990)); *see also In re Discipline of Noble*, 100 Wn.2d 88, 95-96, 667 P.2d 608 (1983).

■■ Our road map in making this inquiry is the ABA *Standards for Imposing Lawyer Sanctions* (1991 ed.) (amended 1992). *See In re Discipline of Dann*, 136 Wn.2d 67, 77, 960 P.2d 416 (1998). The ABA Standards provide for a two-stage process:

"First, we determine a presumptive sanction by considering (1) the ethical duty violated, (2) the lawyer's mental state and (3) the extent of the actual or potential harm caused by the misconduct. Then, we consider any aggravating or mitigating factors which may alter the presumptive sanction."

*In re Discipline of Dann*, 136 Wn.2d at 77 (quoting *In re Discipline of Johnson*, 118 Wn.2d 693, 701, 826 P.2d 186 (1992)).

■ Here, the stipulation of the parties, the findings of the hearing officer, the unanimous adoption thereof by the Board, and the fact the findings were not challenged on appeal by Tasker[3] simplify the first stage of the inquiry.

■ Disbarment is the presumptive sanction under the

---

[3] Unappealed findings are verities. *In re Discipline of Boelter*, 139 Wn.2d 81, 96 n.5, 985 P.2d 328 (1999).

ABA Standards for knowing conversion of client funds with actual or potential injury to the client. ABA Standard 4.11. Disbarment is also the presumptive sanction for failing to maintain personal integrity. ABA Standard 5.11(b) ("Disbarment is generally appropriate when . . . a lawyer engages in any other intentional conduct involving dishonesty, fraud, deceit, or misrepresentation that seriously adversely reflects on the lawyer's fitness to practice.")[4] However, while not the basis of a finding or conclusion by the hearing officer or Board, it is notable that under ABA Standard 4.12, "[s]uspension is generally appropriate when a lawyer knows or should know that he is dealing improperly with client property and causes injury or potential injury to a client," and under ABA Standard 7.2, "[s]uspension is generally appropriate when a lawyer knowingly engages in conduct that is a violation of a duty owed as a professional, and causes injury or potential injury to a client, the public, or the legal system."

Next we determine whether any aggravating or mitigating factors would persuade us to alter the presumed sanction. Disbarment is the ultimate sanction, thus no aggravating factors could alter it upward; mitigating factors could militate in favor of a lower sanction, and aggravating factors could cancel-out any mitigating factors.

Tasker points to delay in the prosecution and interim rehabilitation and cooperation with the bar as mitigating factors. The hearing officer agreed these, along with proportionality, were mitigating factors meriting a reduction from the presumed sanction of disbarment to a one-year suspension.

The parties joust over whether delay is a mitigating factor, or if so, whether it must be prejudicial delay. We

---

[4] In this regard, the hearing officer found, and the Disciplinary Board unanimously adopted, that, based on the stipulated facts, Tasker intentionally misappropriated client funds in an effort to avoid a lawful order of the court to pay child support, as well as a garnishment writ from the Office of Support Enforcement. The hearing officer concluded this "intentional conduct involving dishonesty and fraud which adversely reflects on his fitness to practice" thereby subjects him to the presumptive sanction of disbarment. CP at 376.

have said recently that delay in the prosecution of a case is a mitigating factor to be balanced against any aggravating factors, but it does not automatically merit a reduction in sanction. *In re Discipline of Dann*, 136 Wn.2d at 82-83. *See also Yokozeki v. State Bar*, 11 Cal. 3d 436, 521 P.2d 858, 113 Cal. Rptr. 602 (1974) (unexplained seven-year delay mitigated disbarment to suspension); *Florida Bar v. Thomson*, 429 So. 2d 2 (Fla. 1983) (unexplained delay mitigated suspension to reprimand); *In re Conduct of Morrow*, 303 Or. 102, 734 P.2d 867, 63 A.L.R.4th 647 (1987) (lengthy delay between conduct and charges mitigated sanction); *Vaughn v. State Bar*, 9 Cal. 3d 698, 511 P.2d 1158, 108 Cal. Rptr. 806 (1973) (four-year delay in prosecution mitigated suspension to reprimand); *Louisiana State Bar Ass'n v. Guidry*, 571 So. 2d 161 (La. 1990) (lawyer who committed misconduct by commingling and converting client funds suspended for six months due to three-year delay in bringing charges and intervening rehabilitation). Here Tasker made the most of the delay by demonstrating his willingness and ability to clean up his act, thus showing disbarment is not necessary to protect the public. Moreover Tasker demonstrates the delay in prosecution was caused through no fault of his own, subjected him to the opprobrium of Bellingham's small legal community, and was the result of administrative understaffing and slack prosecution on the part of the association.

By the time the audit of Tasker's trust account was complete in October 1994, the WSBA was in possession of all facts necessary to bring the present disbarment case. The fact it waited, inexplicably, until February 1998 to file the formal charges against Tasker severely undercuts its argument that Tasker must be disbarred to protect the public. After the 1994 audit, Tasker continued to practice law, and in fact brought himself into full compliance with the ethical rules governing trust accounting. Independent audits commissioned by Tasker at considerable expense and performed periodically in the interim confirmed his compliance.

The hearing officer found the delay "very troublesome," and noted that had the case been brought in 1995 he would have recommended disbarment. However the interim rehabilitation and substantial delay in prosecution convinced him to depart from the presumptive sentence. This was true moreover in view of the fact no client actually lost trust money and that Tasker had no intent to permanently deprive his clients of their money.

The WSBA argues several aggravating factors exist to counterbalance any such mitigation. Specifically, the WSBA claims Tasker (1) committed the trust account violations to avoid complying with a lawful court order, (2) Tasker lied at the disciplinary hearing about his knowledge of the trust account violations, (3) Tasker engaged in a pattern of misconduct, and (4) Tasker committed multiple offenses. Factors (1) and (2) appear supported by the evidence—(1) is a matter of stipulation, and (2) is amply demonstrated by Tasker's testimony.

However factor (1) is not entirely unproblematic. The reason Tasker commingled funds in his trust account goes to his motivation and mental state. He did this to insulate his funds from a judgment creditor, however, not in violation of a court order per se. Moreover he did so without intent to permanently deprive his clients of their funds. Commingling funds in trust is improper in itself, not an aggravating circumstance. As the Disciplinary Board dissent noted, "a quality of retribution, engendered perhaps by the majority's evident (and understandable) disgust with the fact that Mr. Tasker's misuse of his trust account involved an effort to shield funds from collection efforts related to a disputed child support order. I do not believe objective review of the circumstances supports disbarment." CP at 1051. Indeed, retribution and punishment are not among the purposes of lawyer discipline. *In re Discipline of Noble*, 100 Wn.2d at 95.

Factor (3) was found by both the hearing officer and Disciplinary Board based on Tasker's continuing and escalated trust account violations over the course of a year.

Factor (4) is problematic because no other conduct was found by the hearing officer to merit anything other than several admonishments and a reprimand, or by the Board in modifying the hearing officer's recommendations, one suspension and several reprimands and admonishments.

Balancing the aggravators and mitigators, no clear direction is presented because the opposing factors would tend to cancel one another out. However so substantial was the delay in prosecution, and so compelling Tasker's turnaround since 1994, we feel disbarment is an inappropriate sanction when the only *undisputed* aggravator is an asserted lack of candor in his disciplinary hearing. On the whole, the WSBA's argument does not clearly indicate why the Board, while adopting the hearing officer's findings of fact, reversed the determination Tasker be suspended rather than disbarred.

 In addition to the ABA Standards, we are directed to the formal, if not "redundant" (*In re Discipline of Boelter*, 139 Wn.2d 81, 103, 985 P.2d 328 (1999)) *Noble* factors enumerated above. The WSBA is no doubt correct that one of the purposes of lawyer discipline—deterring other attorney misconduct (*In re Discipline of McLendon*, 120 Wn.2d 761, 774, 845 P.2d 1006 (1993))—might be served by disbarring Tasker (*Noble* Factor 1). However there is no reason to believe a significant suspension of Tasker would not serve this goal as well, and it would be less likely to be clearly excessive (*Noble* Factor 3). *See also Haskell*, 136 Wn.2d at 318.

With respect to the record developed by the hearing panel (*Noble* Factor 4), suspension would appear to be best supported by the evidence because that was the recommendation arrived at by the hearing officer based on his findings of fact.

 The Disciplinary Board vote was nine-to-one, short of unanimity (*Noble* Factor 5). The dissenting member filed a strongly worded opinion criticizing the majority for departing from the recommendation of the hearing officer. " '[A] recommendation from which there is a dissent may

well be more readily rejected.' " *In re Discipline of Boelter*, 139 Wn.2d at 98-99 (quoting *In re Discipline of Noble*, 100 Wn.2d at 96).

Finally, we examine the proportionality of disbarment in this case (*Noble* Factor 2) to the sanction imposed in similar cases. The hearing officer found disbarment disproportionate.

We find this proportionality review compelling.

In *In re Discipline of Salvesen*, 94 Wn.2d 73, 614 P.2d 1264 (1980), Salvesen repeatedly took client funds from his trust account and commingled the funds into his own accounts and used them without permission, and repaid the trust account only after a client complained. He was suspended for two years.

In *In re Discipline of Malone*, 107 Wn.2d 263, 728 P.2d 1029 (1986), Malone was given a 60-day suspended sentence for misappropriating over $10,000 of client trust funds over a period of eight years. Factors in mitigation were cooperation with the bar audit, and ultimately no shortfall to any client.

In *In re Discipline of McLendon*, 120 Wn.2d 761, 845 P.2d 1006 (1993), McLendon stole nearly $100,000 in client funds to which the clients were never restored. He was not disbarred but was suspended for two years because he suffered from bipolar disorder, despite the fact he brought the condition under control with medication.

In *In re Discipline of Heard*, 136 Wn.2d 405, 963 P.2d 818 (1998), Heard was suspended two years for negotiating a settlement agreement with worthless interests, advising his client to sign it, and then keeping all cash proceeds of the settlement.

In *In re Discipline of Dann*, 136 Wn.2d 67, 960 P.2d 416 (1998), Dann was charged with making misrepresentations on billing statements—lying to clients and charging them a higher partner rate for work an associate performed. A two-year suspension recommendation was mitigated to a one-year suspension because of prosecutorial delay.

Lastly, in *In re Discipline of Haskell*, 136 Wn.2d 300, 962 P.2d 813 (1998), Haskell overbilled clients and included on his bills modest personal expenditures such as first class travel never taken and other expenses—in essence stealing modest amounts of money from clients over a period of time. He was suspended for two years.

On the other hand, arguably similar cases in which lawyers were disbarred for mulcting clients' money involved permanent loss to the clients and greater mendacity on the part of the attorney. In *In re Discipline of Petersen*, 120 Wn.2d 833, 846 P.2d 1330 (1993), Petersen intentionally converted $18,000 in trust funds from 18 different clients and tried to cover up his actions by leaving clients' work undone. In *In re Discipline of Johnson*, 114 Wn.2d 737, 790 P.2d 1227 (1990), Johnson misappropriated $21,051.16 over a nine-month period and then tried to conceal his theft with "subterfuge and deceit." In *In re Discipline of Rentel*, 107 Wn.2d 276, 729 P.2d 615 (1986), Rentel stole $26,000 from his clients. In *In re Discipline of Rosellini*, 97 Wn.2d 373, 646 P.2d 122 (1982), Rosellini intentionally invaded $10,000 of client trust money and, when caught, attempted to cover up the trust account violation with other clients' money held in trust.

One constant distinction running throughout our cases is between intentional theft of client property and knowing misuse of client property. Tasker's case falls closer to the past disciplinary cases involving knowing misuse rather than intentional theft.

Nevertheless a one-year suspension, as recommended by the hearing officer, is disproportionately lenient. A two-year suspension was given in four of the six disciplinary cases similar to Tasker's in which the attorney escaped disbarment. Notwithstanding that none of Tasker's clients suffered monetary deprivation, Tasker's misconduct was intentional and his candor at times before the hearing officer was suspect. We believe the facts and circumstances detailed warrant a two-year suspension. While this sanction is more than the hearing officer would impose, yet less than

the Disciplinary Board would impose, this court has the ultimate responsibility to determine lawyer discipline. *In re Discipline of Halverson*, 140 Wn.2d 475, 500, 998 P.2d 833 (2000) (citing *Heard*, 136 Wn.2d at 423).

Tasker's suspension is to begin on the date of his interim suspension, October 26, 1999.

GUY, C.J., SMITH, JOHNSON, MADSEN, and ALEXANDER, JJ., and SCHULTHEIS, J. Pro Tem., concur.

IRELAND, J. (dissenting) — The court is presented with only one issue in this case: whether an attorney who converts funds in his client trust account to avoid garnishment of funds properly imposed by the Office of Support Enforcement for child support is subject to disbarment. The majority reverses the Disciplinary Board (Board) and imposes a two-year suspension. I would instead uphold the Board's decision that disbarment is the only appropriate sanction. "[Conversion of client funds] mandates disbarment in virtually every circumstance to ensure the protection of the public, the deterrence of lawyer misconduct, and the preservation of public confidence in the bar." *In re Discipline of McLendon*, 120 Wn.2d 761, 763, 845 P.2d 1006 (1993). I therefore dissent.

The Supreme Court retains the ultimate responsibility for determining the nature of an attorney's discipline. *In re Discipline of Espedal*, 82 Wn.2d 834, 838, 514 P.2d 518 (1973). When reviewing attorney discipline matters, this court accords greater weight to the Board's conclusions regarding sanctions than to those of the hearing officer. *In re Discipline of Boelter*, 139 Wn.2d 81, 98, 985 P.2d 328 (1999). In the instant case, the Board properly called for Michael Tasker's disbarment; a decision we should uphold.

The ABA *Standards for Imposing Lawyer Sanctions* (1991 ed. & Feb. 1992 Supp.) (ABA Standards) govern the determination of a sanction in attorney discipline cases in Washington. *In re Discipline of Halverson*, 140 Wn.2d 475, 492, 998 P.2d 833 (2000). The ABA Standards establish a

two-stage process: First, we determine a presumptive sanction by considering (1) the ethical duty violated, (2) the lawyer's mental state and (3) the extent of actual or potential harm caused by the misconduct. Then, we consider any aggravating or mitigating factors which may alter the presumptive sanction. ABA Standards Std. 3.0; *In re Discipline of Johnson*, 118 Wn.2d 693, 701, 826 P.2d 186 (1992); *In re Discipline of Dann*, 136 Wn.2d 67, 77, 960 P.2d 416 (1998).

The facts in this case are straightforward and have been stipulated to by Tasker. Tasker also stipulated to 10 ethical violations, including commingling personal and business funds with client funds to meet his financial obligations. Further, the hearing officer and the Board adopted these findings unanimously, which simplifies the first stage of the inquiry.

Disbarment is the presumptive sanction under the ABA Standards for knowing conversion of client funds with actual or potential injury to the client. ABA Standards Std. 4.11. This standard was clearly violated in this case.

Aggravating and mitigating circumstances may alter the presumptive sanction. *Dann*, 136 Wn.2d at 77. However, the general rule in Washington is stated as follows: "[A] lawyer's failure to preserve the integrity of client funds leads to disbarment, absent *extraordinary* mitigating circumstances." *In re Discipline of Johnson*, 114 Wn.2d 737, 748, 790 P.2d 1227 (1990) (emphasis added). The majority incorrectly concludes that the delay in prosecution of this case is a mitigating factor that would overcome the presumptive sanction. Although the Board failed to process the case effectively for two years, prosecutorial delay does not rise to the level of an extraordinary mitigating circumstance.

Only once since the adoption of the ABA Standards has this court found an "extraordinary mitigating circumstance" sufficient to mitigate the disbarment sanction for misappropriation of client funds. *McLendon*, 120 Wn.2d at 771-72. The *McLendon* court mitigated the sanction to a

two-year suspension because the lawyer suffered from severe bipolar disorder that impaired his ability to have knowledge of his actions. The court found that McLendon's mental illness was so extreme that it diminished his culpability. *Id.* In Tasker's case, "emotional wheels completely falling off" is not a substantially equivalent mitigating factor.

The majority also gives credence to Tasker's apparent rehabilitation during the delay and therefore finds disbarment unnecessary to protect the public. However, it remains clear that from August 1993 to May 1994, Tasker commingled funds, and at one point he had accumulated a deficit of $30,000 in his trust account. As the court recently noted, "[e]nding misconduct does not erase . . . that misconduct which has already occurred. Even where an attorney has been rehabilitated prior to the imposition of discipline, 'the legal system itself has not been redeemed.' " *Boelter*, 139 Wn.2d at 103 (quoting *Dann*, 136 Wn.2d at 83-84 and *In re Discipline of Kennedy*, 97 Wn.2d 719, 723, 649 P.2d 110 (1982)). The appearance of an easy tolerance toward known embezzlers would give the public grave cause for concern and undermine public confidence in the integrity of the profession and of the legal system. *See, e.g., In re Addams*, 579 A.2d 190, 193 (D.C. App. 1990).

The majority relies on the five factors of *Noble*. These factors include: (1) the purpose of attorney discipline; (2) the proportionality of the sanction to the misconduct; (3) the effect of the sanction on the attorney; (4) the record developed by the hearing panel; and (5) the extent of agreement among the members of the Board. *In re Discipline of Noble*, 100 Wn.2d 88, 95-96, 667 P.2d 608 (1983). The following analysis will address each of these factors.

First Factor. The majority is correct in finding that disbarment will deter other attorneys from misconduct. The purposes of lawyer discipline are to "protect the public, deter misconduct of other attorneys, and protect public confidence in our bar . . . ." *McLendon*, 120 Wn.2d at 774.

Second Factor. Although the majority emphasizes disbarment is disproportionate because Tasker's clients did not

lose any funds, this court has disbarred lawyers who repaid all or part of misappropriated funds. *In re Discipline of Petersen*, 120 Wn.2d 833, 837, 846 P.2d 1330 (1993) (lawyer disbarred for misappropriating a $6,827 warrant and $530 in client funds, even though partial restitution was made); *Johnson*, 114 Wn.2d at 742 (lawyer disbarred for misappropriating $21,126.15 from trust account, which was repaid using personal funds); *In re Discipline of Rentel*, 107 Wn.2d 276, 278-79, 729 P.2d 615 (1986) (lawyer disbarred for misappropriating $26,000 from trust account, which was repaid in part); *In re Discipline of Moynihan*, 97 Wn.2d 237, 238, 643 P.2d 439 (1982) (lawyer disbarred for misappropriating $2,650 from trust account, which was repaid using personal funds).

Further, during the proportionality review, the majority cites to *In re Discipline of Salvesen*, 94 Wn.2d 73, 614 P.2d 1264 (1980), a pre-ABA Standards case, in which the facts can be distinguished because Salvesen at no time attempted to excuse or defend his wrongdoing, whereas Tasker impeached himself on cross-examination for time frames regarding culpability. As to the other cases cited by the majority, *Haskell* and *Dann*, although the cases involve serious misconduct, the facts are significantly different since they did not involve misappropriation of client trust funds. *In re Discipline of Haskell*, 136 Wn.2d 300, 962 P.2d 813 (1998). *Malone* can also be distinguished since much of the misconduct was caused by the bookkeeper rather than the attorney. *In re Discipline of Malone*, 107 Wn.2d 263, 264, 728 P.2d 1029 (1986).

Third Factor. Of course, disbarment will cause hardship. However, this hardship should be weighed against the nature of the misconduct to determine whether this is clearly excessive. Again, this court has long held that disbarment is the norm when a lawyer misappropriates client funds. *In re Discipline of Deschane*, 84 Wn.2d 514, 516-17, 527 P.2d 683 (1974). The mere fact that it will cause hardship is not sufficient to merit a lesser sanction.

Fourth Factor. The majority claims suspension would be best supported by the evidence because that was the

recommendation of the hearing officer, based on his findings of fact. The Board's independent review of the evidence shows that disbarment is the appropriate sanction.

Fifth Factor. The court may reject a nonunanimous recommendation from the Board more readily than a unanimous recommendation. *McLendon*, 120 Wn.2d at 769. However, this was a nine-to-one vote. It should not be reversed because no cause has been shown to depart from the Board's overwhelming recommendation that disbarment is the only appropriate sanction given the extreme nature of the misconduct.

The public has a legitimate interest in the security of trust funds held by a lawyer—regardless of the lawyer's financial condition or personal and emotional problems. To preserve public confidence in the legal profession, this court should adhere to the clear rule that lawyers who convert client funds will be disbarred absent truly extraordinary mitigating circumstances. Otherwise, the public will feel there is no protection available from attorney misconduct. Michael Tasker stipulated to the conclusion that he violated his ethical duty and did not preserve the integrity of client funds. Tasker was impeached under oath and committed other misconduct. The facts do not compel a finding of any extraordinary mitigating circumstances. I would affirm the Disciplinary Board's order for disbarment.

BRIDGE, J., concurs with IRELAND, J.