

This opinion was filed for record

at 8:00 am on June 14, 2018

Susan L. Carlson
SUSAN L. CARLSON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| In the Matter of the Disciplinary Proceeding Against | ) ) ) | No. 201,645-6 |
| WILLIAM H. WAECHTER, | ) ) | En Banc |
| an Attorney at Law. | ) ) ) ) ) ) | Filed    JUN 1 4 2018 |

GONZÁLEZ, J.—Attorney William H. Waechter committed multiple lawyer trust account violations. Among other things, he converted client funds and most egregiously, he forged a client's signature on a check. Waechter appeals the Washington State Bar Association (WSBA) Disciplinary Board's (Board) unanimous recommendation to disbar him. He contends that the Board erred by failing to consider the emotional problems mitigating factor and that double jeopardy principles apply. While we agree that the emotional problems mitigator should have been considered in relation to his trust account practices, it carries little weight in this case and does not affect his sanction. We agree with the Board's recommendation and disbar Waechter from the practice of law.

FACTS

Waechter has been a licensed attorney in Washington since 1991. In 2010, he started his own personal injury firm as a solo practitioner. Among his professional banking accounts, Waechter operated a lawyer trust account and his firm's operating account. For about one year, Waechter's paralegal handled the firm's finances and accounting. Upon the paralegal's departure from the firm, Waechter took over the bookkeeping duties.

The WSBA's Office of Disciplinary Counsel (ODC) began investigating Waechter after notification of overdrafts in his trust account. The subsequent audit of Waechter's trust account covered the period in which he maintained the firm's finances: January 1, 2012 through August 6, 2013. The audit revealed numerous violations of the Rules of Professional Conduct (RPC), including trust account discrepancies, theft, conversion of client funds, and a check bearing a client signature that Waechter had forged. *See, e.g.*, Findings of Fact, Conclusions of Law & Hr'g Officer's Recommendation (FFCL) at 3-4 (conversion), 5-12 (theft), 12-13 (failure to maintain lawyer trust account check register), 15-18 (conversion, forgery). WSBA charged Waechter with 15 counts of misconduct arising out of these acts.

Due to the way this case has been framed, some discussion of the facts and procedural history is necessary to properly resolve the issues presented.

2

1.     Trust Account Practices (Counts 1-8)

The following counts involve misconduct arising from Waechter's representation of personal injury clients. For clarity, we discuss the misconduct by charge and as it relates to the specific client involved.

For the first count, Waechter converted thousands of client funds for his own use. Over the course of six transfers from his lawyer trust account, Waechter removed $10,300 that the WSBA's auditor could not attribute to any client. *See* FFCL at 1, 3-4; 1 Verbatim Report of Proceedings (VRP) (May 16, 2016) at 14, 57-58.

These six transfers followed a pattern. Waechter's operating or personal accounts were overdrawn or short of funds; in response, he transferred trust account funds to cover the shortage. *See, e.g.*, 1 VRP (May 16, 2016) at 59-60, 62, 64, 66-67, 71-72, 117, 123. For example, on January 6, 2012, Waechter's business account was in the red: the balance was negative $97.22. Two weeks later, Waechter transferred $100 from the trust account to cover the overdraft, bringing the negative balance of $97.22 to a positive $2.78.

Additionally, in March 2012, Waechter transferred $1,500 from trust into his operating account to avoid an overdraft. He did not record this transfer in his check register. As an explanation for the transfer and why he thought he owned the funds, Waechter claimed another client's subrogation lien would be reduced

and Waechter would then own those funds. But when this transfer was made, the lien had not been reduced and would not be for another seven months.

The hearing officer concluded Waechter removed funds from his trust account unrelated to any client and converted these funds for his own use, violating RPC 8.4(b) (by committing theft), RPC 1.15A(b) (a lawyer must not use, convert, borrow, or pledge client or third person property for the lawyer's own use), and/or RPC 8.4(c) (it is misconduct for a lawyer to engage in conduct involving dishonesty, fraud, deceit, or misrepresentation).

The remaining counts involve misconduct arising from Waechter's representation of five personal injury clients.

For client Karin Huster, Waechter worked on a contingency fee agreement. He would take 33 ⅓ percent of the total settlement. The case settled for $55,000 in February 2012. Waechter told Huster he would reduce his fee and take his third of the settlement from $50,000 instead of the full $55,000. *See* 1 VRP (May 16, 2016) at 150; FFCL at 8. The subrogation interest was reduced. The difference between the subrogation fee and the amount paid from Huster's settlement was $535.62, which Waechter paid to himself by check.

In deposition testimony and at the disciplinary hearing, Waechter acknowledged that Huster did not know the subrogation amount was reduced or that Waechter kept the difference for himself. Waechter also recalled that he was

told the *Mahler* fees[1] applied to Huster's funds after the start of the ODC investigation. He admitted that the $500 should have gone to Huster. Waechter eventually paid the *Mahler* fees on May 2, 2016, after prompting by the WSBA investigator.

The hearing officer determined the counts relating to Waechter's representation of Huster were proved by a preponderance of the evidence. For converting client funds in count 2, the hearing officer found Waechter violated RPC 1.15A(b). For failing to provide an accurate written accounting to Huster and failing to properly pay clients and subrogation parties in counts 7-8, Waechter violated RPC 1.15A(e), RPC 1.4, RPC 1.5(c)(3), and RPC 1.15A(f).

Counts 3-8 concern Waechter's representation of Tori Weisel, David Rowland, Cal Rooks, and Tiffany Judson.

First, Tori Weisel's case settled in October 2012 for a sum of $7,250. The funds were deposited in the trust account. A month later, Waechter wrote a check for $2,000 in fees and deposited it into his personal account. 1 VRP (May 16, 2016) at 126 ("'Weisel fee'" written in the "'Memo'" portion of the check); *see also id.* at 127 (Weisel fee check deposited into Waechter's account); FFCL at 7.

---

[1] *Mahler v. Szucs*, 135 Wn.2d 398, 957 P.2d 632 (1998). This case held insurers must pay insureds their share of legal expenses in order to recover personal injury protection payments.

Waechter later e-mailed Weisel with a breakdown of her settlement, subrogation amount, and costs. In the e-mail, Waechter represented that he "'ha[d] no intention of taking a fee on this matter.'" 1 VRP (May 16, 2016) at 132. Waechter sent a second e-mail saying again that he would take "'[n]o fee, just costs, but costs are very low.'" *Id.* On January 17, 2013, Waechter sent a third e-mail to Weisel reiterating that he would take no fee and that he would pay the $2,500 subrogation. Weisel approved this accounting. Weisel was not made aware that Waechter had already taken a fee in her case or received an updated accounting.

In addition, Waechter issued a check to Weisel for the total client net of $4,648.58 on March 25, 2013. The trust account lacked sufficient funds from Weisel's settlement to cover this check because, as Waechter knew, he had already disbursed the funds to other clients and to himself.

The WSBA investigating officer sent Waechter a letter on October 22, 2014, informing him that neither subrogation party in the Weisel case had been paid. Waechter sent a check to one company for the full amount, even though there were no Weisel funds in trust to pay that amount. The other subrogation party waived its lien. Waechter explained he "didn't have the wherewithal to recognize" the lien had not been pursued or why it had not been paid. *Id.* at 139. Ultimately, Waechter paid the one subrogation holder after notification from the ODC

investigation, nearly two years after the case had settled. He finally paid Weisel the funds she was owed, $1,000, prior to the disciplinary hearing.

The hearing officer concluded Waechter knew the accounting he provided Weisel was false and misleading because he had already taken $2,000 in fees and insufficient funds existed to pay the $2,500 in subrogation fees. The hearing officer found that Waechter converted these subrogation funds intentionally and failed to provide an updated settlement statement or accounting. The hearing officer further determined Weisel was injured by this deception, deprived of an opportunity to object to Waechter's handling of the funds, and deceived as to the amount she was owed.

Waechter also represented David Rowland. The fee agreement for Rowland's case stated Waechter would receive 33 ⅓ percent on gross recovery. The matter settled in February 2012 with a recovery of $55,000.00. Waechter paid Rowland $33,163.38 on February 9, 2012; the subrogation was listed at $8,249.35; and Waechter took $18,331.50 in fees. These numbers were listed as line items on the settlement statement. One subrogation party reduced its claim to $4,496.00. The funds were deposited into trust on February 27, 2012. Waechter paid the subrogation fee not through Rowland's settlement amount but through funds deposited for Weisel and another client.

Regarding Cal Rooks, Waechter settled the case in March 2013 for $11,000. He deposited the sum in trust. Waechter reduced his fee and transferred that amount to his operating account. Waechter owed approximately $8,700 to Rooks. The trust account had insufficient funds to cover this in March 2013. Waechter did not pay Rooks until April 8, 2013. This triggered an overdraft, which Waechter supplemented with his own funds.

Finally, Waechter represented Tiffany Judson. This case settled in January 2014 for $40,000. Waechter deposited the amount into trust and on February 13, 2014, he disbursed the funds: $17,000 to Judson, $13,333 to himself, and approximately $7,900 in subrogation and costs. This left about $1,700 for Judson. But Waechter did not hold these funds in trust for her; instead he wrote a check for that amount to himself.

The hearing officer held that counts 3-8 were proved by a preponderance of the evidence. For count 3, Waechter converted funds owed to Weisel and third party subrogations without permission and with intent to deprive these parties of their funds. Waechter violated RPC 8.4(b), RPC 1.15A(b), RPC 1.15A(f), and RPC 8.4(i).

As to count 4, the hearing officer found Waechter failed to maintain funds in trust for Weisel, Rowland, Rooks, and Judson. This violated RPC 1.15A(c)(1).

For count 5, Waechter violated RPC 1.15A(h)(8) by disbursing funds to Weisel that exceeded the amount she had in trust.

For count 6, the hearing officer determined Waechter misrepresented to Weisel that he took no fee in her case and paid $2,500 to subrogation parties. This violated RPC 8.4(c). For count 7, the hearing officer concluded that Waechter failed to provide an accurate written accounting to Weisel, violating RPC 1.15A(e), RPC 1.4, and RPC 1.5(c)(3).

For count 8, the hearing officer determined that Waechter failed to promptly pay clients and subrogation parties in the Rowland and Weisel matters. This injured them by delaying payment and violated RPC 1.15A(f).[2]

2.    The Shrosbree Matter (Counts 12-15)

These three counts arise from Waechter's representation of his nephew, John Shrosbree. Shrosbree was injured in a car accident in 2007. His personal injury case eventually settled for $90,000. Waechter represented his nephew without a fee agreement and accepted $20,000 as payment.

---

[2] Waechter stipulated to the RPC violations contained in counts 9-11. The WSBA hearing officer found from January 1, 2012 to August 6, 2013, Waechter failed to maintain a check register tracking all transactions from his trust account and a running balance and individual client ledgers for that account. Waechter also failed to reconcile his bank statements with trust account records. According to the hearing officer, counts 9-11 were proved by a preponderance of the evidence, violating RPC 1.15B(a)(1)(v), RPC 1.15B(a)(2), and RPC 1.15A(h)(6). Waechter does not dispute this stipulation. *See* Br. of Appellant at 13; Reply Br. of Appellant at 2-3.

About four years later, in 2012, Waechter received a check for $17,698.32. The check was sent by an insurance company and made out to Waechter and Shrosbree; the memo line noted the check regarded pro rata share of attorney fees per the *Matsyuk* case.[3]

A representative from the insurance company testified at Waechter's disciplinary hearing. The representative explained that after this court's *Matsyuk* decision was published in 2012, the insurance carrier identified Shrosbree's case as one to which *Matsyuk* applied. The insurance carrier determined the appropriate amount to be paid and issued letters to the attorneys of record, advising them of the *Matsyuk* decision, of the additional payment on the claim, and that a check would be forthcoming. The insurance representative also testified his company records reflected a transmittal letter was sent to William Waechter on May 11, 2012.[4] Waechter did not recall receiving the letter.

Waechter failed to notify his nephew about the check when it was received or prior to the ODC audit. However, Waechter did inform his sister, Shrosbree's mother, of the check. She testified at the disciplinary hearing, saying she told her

---

[3] *Matsyuk* refers to this court's opinion *Matsyuk v. State Farm Fire & Casualty Co.*, 173 Wn.2d 643, 272 P.3d 802 (2012). The case clarifies the pro rata fee sharing rule announced in earlier decisions. *Id.* at 647. *Matsyuk* held, among other things, that personal injury protection insureds are entitled to pro rata share of fees incurred in recovering under liability policies. *Id.*

[4] The insurance representative also explained he kept copies of Washington attorney letters that were returned. The representative testified the Waechter letter was not part of the returned letter file and there was no indication the letter was returned.

brother to keep the money. Shrosbree's mother further testified that she had power of attorney over her son at some point. *See* 1 VRP (May 16, 2016) at 210-12. However, Waechter produced only an unsigned power of attorney form, which had expired June 1, 2008, years before he received the insurance check.

After receiving the check and notifying his sister, Waechter deposited the funds in trust, eventually disbursing them to his office account and to pay a bill. To deposit the funds, Waechter signed his nephew's name on the check. The hearing officer specifically inquired into why Shrosbree did not sign the check. Waechter testified his nephew could not be given the money because he would have left town and spent the money on drugs. Waechter had no permission to take the funds, nor did he provide a written accounting or inform his nephew of the distribution.

Despite the memo line informing him that the funds were related to, in some way, *Matsyuk* fees, Waechter did not investigate, inquire, or determine to whom the funds belonged. *See id.* at 205-06. He testified at the disciplinary hearing that he was "puzzled" about the fees and knew he needed to "figure [it] out." *Id.* at 206. Waechter stated that he may have read the *Matsyuk* case or a review of it, but he did not resolve ownership prior to accepting the funds.

The hearing officer determined counts 12-15 had been proved by a preponderance of the evidence. For count 12, Waechter failed to inform Shrosbree

of the insurance check, violating RPC 1.4(a)(1), RPC 1.4(a)(3), RPC 1.4(b), and RPC 1.15A(d). For count 13, Waechter converted funds by depositing the insurance check for his own use, violating RPC 8.4(b) (theft), RPC 1.15A(b), RPC 8.4(c), and RPC 8.4(i). For count 14, Waechter signed his nephew's name on the check, presented, and deposited it knowingly in violation of RPC 8.4(b) (forgery), RPC 8.4(c), and RPC 8.4(i). Finally, for count 15, because Waechter did not provide Shrosbree a written account of the distribution of the insurance funds, Waechter violated RPC 1.15A(e).

## PROCEDURAL HISTORY

After a hearing in May 2016, the hearing officer concluded that WSBA had proved all charged counts. Applying the American Bar Association's *Standards for Imposing Lawyer Sanctions* (1991 & Supp. 1992), the hearing officer determined that Waechter should be disbarred for 5 of the counts (counts 1, 12-15) and suspended for 10 (counts 2-11).

The hearing officer found four aggravating factors: dishonest or selfish motive, pattern of misconduct, multiple offenses, and substantial experience in the practice of law. Four mitigating factors ultimately applied, including absence of prior discipline, full and free disclosure to the disciplinary board, character or reputation, and remorse. The hearing officer recommended disbarment and payment of restitution.

Waechter moved for reconsideration of the sanction. Instead of disbarment, he sought suspension of up to three years and oversight by a local attorney to monitor Waechter's financial practices. The Board denied reconsideration, and it unanimously adopted the hearing officer's decision. We granted Waechter's request for review of the Board's recommendation.

## ANALYSIS

The Washington State Supreme Court is the definitive authority for attorney discipline. *In re Disciplinary Proceeding Against Kuvara*, 149 Wn.2d 237, 246, 66 P.3d 1057 (2003). This court gives considerable weight to the hearing officer's findings of fact, particularly when they address credibility and veracity of witnesses. *In re Disciplinary Proceeding Against Poole*, 156 Wn.2d 196, 208-09, 125 P.3d 954 (2006). This court will uphold those findings provided they are supported by substantial evidence. *Id.* at 208 (quoting *In re Disciplinary Proceeding Against Guarnero*, 152 Wn.2d 51, 58, 93 P.3d 166 (2004)). We recognize "that the hearing officer is in the best position to determine factual findings regarding a lawyer's state of mind and his [or her] decision is given 'great weight' on review." *In re Disciplinary Proceeding Against Cramer*, 165 Wn.2d 323, 332, 198 P.3d 485 (2008) (quoting *In re Disciplinary Proceeding Against Longacre*, 155 Wn.2d 723, 744, 122 P.3d 710 (2005)). We review a hearing officer's conclusions of law de novo. *Id.* at 331.

Waechter raises three issues for this court's review. First, the Board should have applied the emotional problems mitigating factor to his sanction; second, the charged misconduct violated double jeopardy principles; and third, disbarment was inappropriate. We will address each issue in turn.

## 1. The Board Erred by Failing To Apply the Emotional or Personal Problems Mitigating Factor

At the outset, Waechter is correct that the Board erred by failing to consider his emotional or personal problems as a mitigating factor in its decision. The hearing officer applied four mitigating factors to Waechter's case: absence of prior discipline, full and free disclosure to the disciplinary board or cooperative attitude toward proceedings, character or reputation, and remorse. In the original ruling, the hearing officer listed two additional factors, personal or emotional problems and mental disability. The hearing officer considered and rejected Waechter's argument that he suffered emotional problems. The ODC moved to modify the ruling, arguing that the evidence was insufficient to establish the two mitigating factors of personal or emotional problems and mental disability. The Board granted ODC's motion.

14

Here, Waechter argues the testimony of Dr. Marta Miranda that Waechter likely suffered vicarious traumatization or compassion fatigue constitutes an emotional or personal problems mitigating factor.[5]

Dr. Miranda testified that compassion fatigue often occurs in "the helping professions" like social workers and lawyers. 3 VRP (May 18, 2016) at 502. These professionals do not experience trauma themselves, but they suffer as a result of working with traumatized populations. Relevant to Waechter's case, symptoms of compassion fatigue include avoiding traumatic material, mental dissociation from daily life, avoidance, and becoming "jaded." *Id.* at 504. Dr. Miranda testified that Waechter's three successive personal injury case losses in 2012 and his overidentification with his clients led to compassion fatigue. The doctor stated it was likely these losses and the resulting secondary trauma caused Waechter to be careless and avoid stresses, such as his bookkeeping duties. Dr. Miranda further testified that she did not believe Waechter took his clients' funds or transferred trust account funds with a conscious intent.

---

[5] In his briefing, Waechter states that although he "*did* satisfy the requisite burden of proof to show 'mental disability,' there can be no doubt that there was significant testimony providing that he was suffering significant personal and emotional problems." Br. of Appellant at 33 (emphasis added). Aside from this statement, Waechter does not provide argument or citation to the record that the mental disability mitigator applies. Moreover, the evidence does not support that compassion fatigue "caused [his] misconduct." *In re Disciplinary Proceeding Against Poole*, 164 Wn.2d 710, 733, 193 P.3d 1064 (2008) ("a mental disability is a mitigating factor if, among other things, it 'caused the misconduct'" (quoting STANDARDS std. 9.32(i))).

A personal or emotional problems mitigator requires only "a connection between the asserted problem and the misconduct." *In re Disciplinary Proceeding Against Holcomb*, 162 Wn.2d 563, 591, 173 P.3d 898 (2007). WSBA argues Waechter does not show a connection between his compassion fatigue and his forgery and conversion of client funds. And despite his emotional problems, Waechter was aware of his ethical obligations regarding trust accounts and admitted "'I know you can't do what I did.'" 3 VRP (May 18, 2016) at 530.

We agree with the ODC in part. Dr. Miranda's testimony does not establish a connection between the trauma and Waechter's decisions to convert client funds and forge his nephew's signature. However, the testimony does establish a connection between Waechter's compassion fatigue and his poor bookkeeping. Accordingly, the Board erred in failing to consider this mitigator when it considered the sanction for Waechter's trust account violations.

In any event, the emotional problems mitigating factor carries little weight. A mitigator's weight is determined by the totality of the circumstances. *In re Disciplinary Proceeding Against Poole*, 164 Wn.2d 710, 734, 193 P.3d 1064 (2008). Here, the evidence does not reflect that Waechter's compassion fatigue caused him to forge his nephew's signature, and despite these emotional problems, Waechter was still aware of his ethical obligations as a lawyer. Where the personal and emotional problems "merely impacted but did not cause the misconduct," we

conclude the mitigating factor should be given little weight. *Id.*; 3 VRP (May 18, 2016) at 533 (Waechter's own expert testified only that his decisions were "'impacted by vicarious traumatization.'").

Furthermore, this mitigating factor is not so "extraordinary" as to justify varying from the presumptive sanction of disbarment. *In re Disciplinary Proceeding Against Schwimmer*, 153 Wn.2d 752, 760, 108 P.3d 761 (2005). A lawyer's failure to preserve the integrity of clients' funds leads to disbarment, absent extraordinary mitigating circumstances. *Id.* Although the Board erred by not considering the emotional problems mitigator, the factor itself should be given little weight and thus it does not affect the sanction Waechter received.

2. Double Jeopardy Does Not Apply to Attorney Discipline Proceedings

WSBA charged Waechter with 15 counts of misconduct, including violations of multiple ethical duties. *See, e.g.*, FFCL at 4 (count 1: Waechter's conduct violated RPC 8.4(b) (by committing theft), RPC 1.15A(b), and RPC 8.4(c)); FFCL at 11 (count 2: Waechter converted funds violating RPC 1.15A(b)).

Waechter contends that the 15 charges punish him more than once for the same conduct in violation of double jeopardy.[6] WSBA urges us not to consider the issue because it was belatedly raised—Waechter failed to argue double jeopardy

---

[6] Relevant to the instant case, double jeopardy violates the Fifth Amendment and art. I, § 9 protection against multiple punishments for the same offense. U.S. CONST. amend. V; WASH. CONST. art. I, § 9.

below and so cannot raise it for the first time on appeal. Waechter argues that as a matter affecting a constitutional right under RAP 2.5(a)(3), he may first argue it here.

Assuming, without deciding, that Waechter may raise the issue for the first time on appeal, we conclude double jeopardy does not apply to attorney discipline.

This appears to be a matter of first impression in Washington. As such, we look to other jurisdictions for information and guidance. *Anthis v. Copland*, 173 Wn.2d 752, 760, 270 P.3d 574 (2012); *In re Welfare of Colyer*, 99 Wn.2d 114, 119, 660 P.2d 738 (1983).

Our sister jurisdictions that have addressed the issue have concluded that the double jeopardy clause is not implicated in attorney disciplinary proceedings. *See In re Chastain*, 340 S.C. 356, 363-64, 532 S.E.2d 264 (2000) (citing *In re Caranchini*, 160 F.3d 420, 423 (8th Cir. 1998) (while disbarment may be considered punishment in common parlance, attorney discipline, including disbarment and other sanctions, is not punishment for purposes of double jeopardy); *Miss. State Bar v. Young*, 509 So.2d 210, 213 n.1 (1987) ("Most states which have addressed the matter have held that disciplinary proceedings are not so criminal in nature as to evoke double jeopardy protections."); *In re Brown*, 12 Cal. 4th 205, 906 P.2d 1184, 1191, 48 Cal. Rptr. 2d 29 (1995) (disciplinary action does not take the form of traditional criminal sanctions, but rather consists of reproval,

suspension from the practice of law, or disbarment; thus, double jeopardy did not bar disciplinary action that followed lawyer's nolo contendere plea in criminal case); *People v. Marmon*, 903 P.2d 651, 655 (Colo. 1995) (disciplinary sanction is not punishment for double jeopardy purposes; court noted that a contrary conclusion would lead to absurd result that lawyers convicted of criminal offenses could never be disciplined); *In re McDaniel*, 470 N.E.2d 1327, 1328 (Ind. 1984) (double jeopardy does not prohibit review of charges of misconduct in disciplinary proceeding even though the lawyer may have been found not guilty of the charges in a criminal proceeding)).[7]

The goals of attorney discipline and criminal prosecutions differ, as do the potential consequences imposed. Lawyer discipline consists of reproval, suspension from legal practice, or disbarment. *In re Disciplinary Proceeding Against Fossedal*, 189 Wn.2d 222, 241, 399 P.3d 1169 (2017). This discipline does not take the form of traditional criminal sanctions like monetary fines or incarceration—that is, the loss of liberty. *In re Brown*, 906 P.2d at 1191. The Supreme Court of Pennsylvania explored the potentially absurd consequences of

---

[7] *See also In re Discipline of Babilis*, 951 P.2d 207, 214 (Utah 1997) ("The penalties available under the Standards for Imposing Lawyer Sanctions are not punishment for double jeopardy purposes."); *In re Disciplinary Matter Involving Triem*, 929 P.2d 634, 641 (Alaska 1996) (concluding double jeopardy protection does not extend to attorney grievances); *State ex rel. Okla. Bar Ass'n v. Giger*, 2004 OK 43, 93 P.3d 32, 37 ("Because professional disciplinary proceedings are remedial, not punitive, they are not subject to double jeopardy strictures."); *Att'y Grievance Comm'n. v. Brown*, 308 Md. 219, 517 A.2d 1111, 1112 (1986) (attorney's former jeopardy claim rejected "because lawyer discipline proceedings are not criminal proceedings").

requiring double jeopardy protections in attorney discipline. *Office of Disciplinary Counsel v. Campbell*, 463 Pa. 472, 481, 345 A.2d 616 (1975). That court explained that should disciplinary actions be viewed, for constitutional purposes, as placing an individual in jeopardy, an attorney convicted of a crime could not be then disbarred for that crime. *Id.* If an attorney sanction and criminal prosecution would bar the other, the State would have little ability to protect the public. *Id.*

Attorneys possess due process rights in disciplinary proceedings. *See, e.g.*, *In re Stroh*, 97 Wn.2d 289, 302-03, 644 P.2d 1161 (1982) (Utter, J., dissenting) ("[W]e still must meet constitutionally established minimum due process standards in disbarment cases." (citing *In re Ruffalo*, 390 U.S. 544, 88 S. Ct. 1222, 20 L. Ed. 2d 117 (1968))); *In re Disciplinary Proceeding Against Marshall*, 167 Wn.2d 51, 70, 217 P.3d 291 (2009) (discussing the due process requirement that an attorney be notified of specific charges and given opportunity to address them). But Waechter presents no persuasive reason to import double jeopardy protections into this process.

We therefore join our sister courts on this matter. Attorney discipline is not subject to double jeopardy protection.[8]

---

[8] To the extent Waechter challenges the aggravating factor of "multiple offenses" as violating double jeopardy, Br. of Appellant at 41-45, this claim is without merit.

3. Disbarment Was Proper

Finally, Waechter asks that we reject disbarment and instead impose a two-year sanction. For the reasons set forth below, we decline to do so and agree with the Board's ruling that Waechter be disbarred.

We review sanctions de novo, but where a sanction is recommended by a unanimous board, we will uphold it "in the absence of a clear reason for departure." *In re Disciplinary Proceeding Against Whitt*, 149 Wn.2d 707, 717, 72 P.3d 173 (2003). The court will adopt the Board's recommended sanction unless the sanction is not proportionate or the Board was not unanimous in its decision. *In re Disciplinary Proceeding Against Miller*, 149 Wn.2d 262, 277-78, 66 P.3d 1069 (2003). Proportionate sanctions are those that are "roughly proportionate to sanctions imposed in similar situations or for analogous levels of culpability." *In re Disciplinary Proceeding Against Gillingham*, 126 Wn.2d 454, 469, 896 P.2d 656 (1995).

Since the Board unanimously adopted the hearing officer's ruling here, we must review whether disbarment is proportional. Waechter contends this court has not disbarred attorneys for similar conduct. Br. of Appellant at 45-47 (citing *In re Disciplinary Proceeding Against McKean*, 148 Wn.2d 849, 64 P.3d 1226 (2003); *In re Disciplinary Proceeding Against Tasker*, 141 Wn.2d 557, 9 P.3d 822 (2000); *In re Disciplinary Proceeding Against Young Suk Oh*, 176 Wn.2d 245, 290 P.3d

963 (2012); *In re Disciplinary Proceeding Against Blanchard*, 158 Wn.2d 317, 144 P.3d 286 (2006); *In re Disciplinary Proceeding Against Trejo*, 163 Wn.2d 701, 185 P.3d 1160 (2008); *In re Cramer*, 165 Wn.2d 323).

These cases are distinguishable. First, in a majority of these cases, the presumptive sanction was not disbarment, it was suspension. *In re McKean*, 148 Wn.2d at 875; *In re Oh*, 176 Wn.2d at 257-58; *In re Blanchard*, 158 Wn.2d at 335-36; *In re Trejo*, 163 Wn.2d at 709; *In re Cramer*, 165 Wn.2d at 339. Further, these cases largely concern mishandling of client trust funds and failure to keep adequate financial records. *See In re McKean*, 148 Wn.2d at 859-60; *In re Oh*, 176 Wn.2d at 253-56; *In re Blanchard*, 158 Wn.2d at 335; *In re Trejo*, 163 Wn.2d at 708-09, 710-11; *In re Cramer*, 165 Wn.2d at 327. While Waechter too mishandled his lawyer trust account and kept inadequate financial records, his misconduct was far more significant than the negligence reflected in the cases he cites—most egregiously, he forged his nephew's signature on a check. *Tasker* is also distinguishable because although the Board recommended disbarment, this court held a two-year suspension was appropriate in light of an almost four-year-long delay in filing charges, the attorney's demonstrated rehabilitation, and the fact that no client suffered monetary deprivation. 141 Wn.2d at 572-73.

The cases Waechter cites do not demonstrate that disbarment is a disproportionate sanction. Accordingly, we defer to the unanimous Board's recommendation of disbarment.[9]

## CONCLUSION

While the Board erred in failing to consider Waechter's emotional or personal problems as a mitigating factor, the mitigator is afforded little weight under the circumstances of this case and does not affect the sanction. We conclude that double jeopardy does not apply to attorney discipline proceedings. Therefore, we disbar Waechter from the practice of law and order the hearing officer's recommended restitution payments.

---

[9] Waechter further claims the evidence does not support the hearing officer's findings on injury and intent. Regarding injury, he states that "[u]nder these circumstances, it is difficult, if not impossible, to establish there was any real serious injury sustained by these clients," Reply Br. of Appellant at 4. This statement appears to contend that the facts of his case do not support a finding of injury to his clients because Waechter reimbursed all the wrongfully acquired funds. Regarding intent, Waechter claims "the determination that he 'knowingly' appropriated client funds cannot stand where the facts more plainly support negligence." Br. of Appellant at 27. Waechter merely asserts these claims are true; he presents no argument and points to no support from the record. We decline to consider these issues here. *In re Poole*, 164 Wn.2d at 724-25 (an attorney must argue why factual findings are not supported by the evidence and provide supporting record citations). Nevertheless, we take this opportunity to note that an attorney cannot evade sanction for trust account violations by claiming his or her clients were eventually made whole. Here, but for Waechter's misconduct, his clients would not have been harmed. Their injuries live on through delayed payments, deception, and broken trust. Reimbursing funds wrongfully obtained does not remove that wrong. *In re Schwimmer*, 153 Wn.2d at 761 (repayment does not erase misconduct).

_____
González, J.

WE CONCUR:

_____     _____
                                     Stephens, J.

_____     _____
                                     Alexander McCloud, J.

_____     _____
Owens, J.                            Ire, J.

*In re Discipline of Waechter (William H.)*

No. 201,645-6

MADSEN, J. (concurring/dissenting)—I agree with the majority's decision to follow the Washington State Bar Association Disciplinary Board's (Board) recommendation to disbar William Waechter from the practice of law. I write separately because I disagree with the majority's holding that the Board erred when it adopted the hearing officer's decision not to apply the personal or emotional problems mitigating factor. The majority fails to give deference to the hearing officer's discretion in disciplinary proceedings, and its holding is not supported by the record.

Further, to apply the personal or emotional problems mitigator there must be "a connection between the asserted problem and the misconduct." *In re Disciplinary Proceeding Against Holcomb*, 162 Wn.2d 563, 591, 173 P.3d 898 (2007). The majority holds that the personal or emotional problems mitigator applies because the testimony of Dr. Marta Miranda establishes a connection between Waechter's compassion fatigue and his poor bookkeeping. Majority at 16. The majority also holds that there is no connection between Waechter's compassion fatigue and his "decisions to convert client funds and forge his nephew's signature." *Id.* But, this makes little sense since the

evidence demonstrates that "poor bookkeeping" was the mechanism Waechter used to cover up his theft and forgery.

## Discussion

The majority states that

> [w]e recognize "that the hearing officer is in the best position to determine factual findings regarding a lawyer's state of mind and his [or her] decision is given 'great weight' on review."

*Id.* at 13 (second alteration in original) (quoting *In re Disciplinary Proceeding Against Cramer*, 165 Wn.2d 323, 332, 198 P.3d 485 (2008) (quoting *In re Disciplinary Proceeding Against Longacre*, 155 Wn.2d 723, 744, 122 P.3d 710 (2005))). However, in holding that the personal and emotional problems mitigator applies here, the majority fails to apply this guideline and disregards critical findings of fact.

Specifically, the hearing officer found that it was impossible for Dr. Miranda to "ascertain [Waechter's] 'state of mind at the time he breached the standards of his profession,'" because she evaluated him three years after his instances of misconduct, and Dr. Miranda admitted as much in her testimony. Clerk's Papers (CP) at 473 (Findings of Fact, Conclusions of Law & Hr'g Officer's Recommendation (FFCL) 178). The hearing officer correctly determined that Dr. Miranda's testimony failed to establish a connection between the emotional condition and Waechter's misconduct, so it follows that the hearing officer was correct in declining to apply the personal and emotional problems mitigator.

2

Additionally, the majority considers Waechter's instances of misconduct in isolation. The majority acknowledges that Waechter committed forgery and converted client funds. Yet the majority fails to see the connection between these crimes and Waechter's "poor bookkeeping," as the majority characterizes it. It is highly improbable that a person who committed forgery and conversion failed to keep his financial books in order because of compassion fatigue. Rather, as the hearing officer concluded, Waechter knowingly made inaccurate accountings with the intent to deceive his clients and hide his misconduct. CP at 470-71 (FFCL 168, 174). Indeed, it would make no sense for Waechter, who was actively engaged in the theft, to accurately track misappropriated funds.

Accordingly, I concur in the majority's outcome but disagree with respect to the majority's holding that the Board erred when it adopted the hearing officer's decision not to apply the emotional or personal problems mitigating factor.

Madsen, J.

Fairhurst, C.J.

Johnson

Wiggins, J.